WEST & CO. of LA., Inc. *v.* A. Gene SYKES, INSURANCE COMMISSIONER, STATE of Arkansas

74-157                                               515 S.W. 2d 635

Opinion delivered November 18, 1974

*Campbell, Campbell, Marvin & Johnson; Chambers & Chambers and Reed Williamson,* for appellant.

*W. H. L. Woodyard III, W. R. Ruddell* and *S. Doak Foster,* for appellee.

CONLEY BYRD, Justice. The issue here is whether appellant West & Co. of Louisiana, Inc. by furnishing to its employees a group hospital and surgical benefit plan is transacting the business of insurance contrary to the provisions of Acts 1959, No. 148, Ark. Stat. Ann. § 66-2001 et seq. The trial court held in favor of appellee, A. Gene Sykes, Insurance Commissioner, State of Arkansas and enjoined appellant from "assuming and agreeing to pay, and paying out of its own funds, all or any portion of such benefits" until it had complied with the Arkansas Insurance Code.

Appellee concedes that the facts are not in dispute. They show that West & Co. of Louisiana, Inc. operates a group of Department Stores in Louisiana, Arkansas, Mississippi, Alabama and Texas. It furnishes to its employees a number of fringe benefits such as sick leave, profit sharing and the "group hospital and surgical benefit plan" that is here involved. The cost of the group hospital and surgical plan is shared with those employees who participate therein. A single employee pays $9.00 per month and an employee with a family pays $18.00 per month irrespective of age, health or number of dependents covered. Appellant sustains the balance of the cost of the plan including all administrative expenses. The record shows that for the last five years appellant

in addition to the administrative expenses has paid out in benefits $102,781.72, more than the employees have paid in. The undisputed evidence is that the plan, very similar to a number of medical plans offered by insurance companies generally, if carried by an insurance company would cost each employee in excess of $40.00 per month.

To sustain the action of the lower court appellee relies upon the following provisions of the Arkansas Insurance Code:

"Ark. Stat. Ann. § 66-2002 (Repl. 1966). INSURANCE DEFINED. 'Insurance' is a contract whereby one undertakes to indemnify another to pay a specified amount or provide a designated benefit upon determinable contingencies.

"Ark. Stat. Ann. § 66-2003 (Repl. 1966). INSURER DEFINED. 'Insurer' includes every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance.

"Ark. Stat. Ann. § 66-2009 (Repl. 1966). TRANSACTING INSURANCE. 'Transact' with respect to insurance includes any of the following:

(1) Solicitation and inducement.
(2) Preliminary negotiations.
(3) Effectuation of a contract of insurance.
(4) Transaction of matters subsequent to effectuation of a contract of insurance and arising out of it."

The appellee then quotes from 12 Appleman, *Insurance Law & Practice*, § 7001 as follows:

"Whether the contract is one of insurance must be determined from its purpose, effect, content, terminology, and conduct of the parties, and not from its designation therein, since a contract which is fundamentally one of insurance cannot be altered by the use or absence of words in a contract itself. The Court must look also to the intention of the parties in making this determination."

The appellant on the other hand relies upon 12 Appleman, *Insurance Law & Practice,* § 7002, which provides in part as follows:

> "A statute designed to regulate the business of insurance, growing out of experience with them and evils developing in them, is not intended to apply to all organizations having some element of risk assumption or distribution in their operations. The question of whether an arrangement is one of insurance may turn, not on whether a risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose. The courts of the District of Columbia have been prone to regard non profit group medical and hospitalization plans as not constituting insurance.

> "The courts have been prone, doubtless because of the charitable and self-sufficient nature of railroad relief associations, to hold that they are not insurance companies within the provisions of regulatory acts. Similarly, a contract made by a corporation conducting a hospital, providing that for a stated consideration a woman should be received into the hospital and cared for the rest of her life, was not considered to constitute insurance, nor to be ultra vires nor against public policy. Pure endowment or annuity contracts have been considered not true insurance contracts."

Keeton, *Insurance Law-Basic Text,* 8.2(a), makes the observation that statutory definitions of insurance as provided in Calif. Ins. Code § 22 (West 1955) and Mass. Gen. Laws Ann. ch. 175, § 2, (1958), are "so broad and general as to be virtually useless as guides to determine applicability of the regulatory system in a disputed setting." The Calif. Ins. Code § 22 provides:

> "Insurance is a contract whereby one undertakes to indemnify another against loss, damage or liability arising from a contingent or unknown event."

In a footnote at page 543 *Keeton, supra,* states:

"Arguably these statutes should be read not as stating that every transaction having the stated characteristics is insurance but only as saying that no transaction is insurance unless it has these characteristics. If so construed, there would seldom be any occasion to invoke them since it is not likely that a transaction lacking these characteristics would be alleged to be insurance even if there were no statutory definition of that term. Reading these statutes instead as stating that all transactions having these characteristics are insurance would be to give them a meaning plainly inconsistent with the much narrower scope of regulation in practice. Many arrangements having these characteristics are never asserted to be insurance even by the most aggressive of regulatory officials."

Other jurisdictions generally support the above quotations from *Appleman* § 7002, *supra,* and *Keeton, supra.* See *State* v. *Pittsburgh, C.C. & St. Louis Ry. Co.*, 68 Ohio St. 9, 67 N.E. 93 (1903) and *Colaizzi* v. *Pennsylvania R. Co.*, 208 N.Y. 275, 101 N.E. 859 (1913), holding that the operation of "railroad relief associations" do not constitute the doing of an insurance business. In *California-Western St. Life Ins. Co.* v. *State Bd. of Eq.*, 151 Cal. App. 2d 559, 312 P. 2d 19 (1957), the retirement fund there involved was handled by the employer, a life insurance company, in much the same manner as the "West Plan" here involved. After noting that the plan offered to the employees was optional; that it was not offered to persons other than employees; and that the plan was not actuarially sound and was intended that way, the court in holding that the plan did not constitute an insurance contract, stated:

". . . Regardless of the noted similarities in so many of the provisions contained in the plan to those found in annuity policies regularly sold by insurers, the great dissimilarity which inheres is the total absence of profit motive — never ignored by successful insurers — compels a conclusion that the establishment and maintenance of respondent's employees' retirement plan cannot be classified as insurance business done by it in this state. Such was not its purpose and such was not its nature. . . ."

In holding that a guaranteed maintenance contract on trucks was not an insurance contract, the California Supreme Court, in *Transportation Guarantee Co.* v. *Jellins*, 29 Cal. 2d 242, 174 P. 2d 625 (1946), made the following observations:

"[8, 9] In construing the contracts in question it must be borne in mind that nearly every business venture entails some assumption of risk, some element of gambling. The retail merchant when he purchases his stock assumes the risk of lower prices, of receding demand, of spoilage or deterioration of perishable goods; he gambles on his ability to dispose of the stock before it loses value or, perhaps, to hold it until there is an increment of value. The lawyer who contracts to prosecute a case to final judgment for a fixed or contingent fee assumes the risk of long litigation, of repeated trials and reversals. The lessee who agrees to hold his lessor harmless for damage to property of, or injury to, third persons occurring on the leased premises; the lessor who agrees to keep the premises in repair; even the surety on a note, assume a risk and indemnify another against loss. If the defense in this action is to prevail it is but another step to assert that same defense in actions arising out of any of the risk-indemnification agreements mentioned. We are satisfied that a sound jurisprudence does not suggest the extension, by judicial construction, of the insurance laws to govern every contract involving an assumption or risk or indemnification of loss; that when the question arises each contract must be tested by its own terms as they are written, as they are understood by the parties, and as they are applied under the particular circumstances involved."

The appellee to sustain its contention that the contract in question constitutes the transacting of an insurance business under the Arkansas Insurance Code, points to our decision in *Bost* v. *Masters*, 235 Ark. 393, 361 S.W. 2d 272 (1962), involving service upon the United Furniture Workers Insurance Fund as an unauthorized insurer under the "Unauthorized Insurers Process Act," Ark. Stat. Ann. §§ 66-2903 through 66-2907 (Repl. 1966). The fund there was a separate fund classified by its settlors as an "insurance fund" and presumably actuarially sound since it was funded by a

"stated percentage of the wages" paid by the contributing employers to their employees during the preceeding month.

Now obviously the statutory definitions if given a literal interpretation are broad enough to support appellee's position that the "West Plan" is an insurance contract. However, if we give to the definitions the literal interpretation that appellee espouses then the definitions encompass among other things the ordinary landlord and tenant arrangement where one or the other agrees to rebuild within a specified time or be subject to certain specified liquidated damages. Of course, as pointed out by the authorities, discussed above, the regulation of landlord and tenant contracts was never considered not contemplated in the drafting or enacting of insurance codes. Since it at once becomes obvious that we should not give a literal interpretation to the statutory definitions, the question resolves itself as to where we should draw the line as to what is and what is not included. Under these circumstances we believe that the best policy is to approach the matter on a case by case basis and in accordance with the purpose of the evils to be regulated as disclosed by the authorities and the adjudicated cases from this and other jurisdictions. When the matter is approached from that view, we find that fringe benefits furnished to employees on an optional basis that are substantially supported by the employer's profits and that are not intended to be actuarially sound are generally regarded as not being regulated by the insurance codes of the several states. Consequently, it follows that the trial court was in error when it enjoined appellant from paying out benefits under its plan.

Reversed and dismissed.