Fletcher BELL, Commissioner of Insurance of the State of Kansas, Plaintiff,

v.

EMPLOYEE SECURITY BENEFIT AS-SOCIATION, an unincorporated association, Duane Tresham, president of Employee Security Benefit Association, Defendants.

No. 77–4066.

United States District Court, D. Kansas.

Aug. 22, 1977.

384

Michael S. Mullen, Sp. Asst. Atty. Gen., Kansas State Ins. Dept., Topeka, Kan., for plaintiff.

Lyle E. Neeley, Bellevue, Wash., R. Austin Nothern, Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This case involves an interpretation of the Employee Retirement Income Security Act of 1974 (ERISA), and comes before the Court for a decision on the merits as to plaintiff's prayer for permanent injunctive relief. Jurisdiction is predicated upon 28 U.S.C. § 1337, and venue is proper under 28 U.S.C. § 1391(c).

Plaintiff Bell is the Commissioner of Insurance of the State of Kansas. Defendant Employee Security Benefit Association (ESBA) is an unincorporated association headquartered in Bellevue, Washington. Defendant Tresham is ESBA's president.

ESBA is (or was until this suit was filed) soliciting agents to offer to the working people of Kansas (and other States) what it terms an "employee benefit plan". On April 22, 1977, plaintiff filed a complaint seeking to enjoin ESBA's activities in Kansas until ESBA complies with the statutes and regulations governing the business of insurance in Kansas. Also on April 22, 1977, this Court granted plaintiff's request for a temporary restraining order which enjoined defendants from doing further business in Kansas until a preliminary injunction hearing could be held. On June 24, 1977, this action came before the Court for a hearing as to the merits of the action, the preliminary injunction hearing having been consolidated with the hearing on the merits pursuant to F.R.Civ.P. 65(a)(2). Despite the fact that defendants had received adequate notice of the hearing, they intentionally defaulted by failing to appear. At the hearing, plaintiff presented depositions of several of the principals of ESBA, and the Court considers the evidentiary record before it an adequate basis for the rulings which must be made.

The crux of this case involves interpretation of the provisions of ERISA, 29 U.S.C. § 1001, et seq. Plaintiff argues that defendants' program is a program of "insurance" which is subject to regulation by the Kansas Department of Insurance. Defendants argue that ESBA's program is not "insurance", but an "employee benefit plan" which, under ERISA, is allegedly exempt from all state regulation.

## FACTUAL BACKGROUND

ESBA's brochure announces that ESBA is offering "A New Concept in 'MEMBER EMPLOYEE BENEFIT PLANS'". The brochure indicates that the program is a "Major Medical Expense and Graded Death Benefit Plan For Members and Member's Families." By way of further description, the brochure describes the program in these terms: "This is a Self-funded, Self-adjusting Employee Benefit Plan established under Public Law 93–406. 'Employee Retirement Income Security Act of 1974.'"

Article 3, Section 1 of ESBA's Articles of Association indicates that membership in ESBA is available to any employee in reasonably good health who has been employed in a common work unit for at least one month, and who pays a $10 membership fee.

Any fair evaluation of the product offered by ESBA must lead to the conclusion that this "employee benefit plan" is substantially similar to major medical and death benefit coverage offered by insurance companies generally. (See Quine deposition, p. 10)

The organizers of ESBA are individuals with substantial experience in the insurance field. ESBA employs insurance agents to solicit members. ESBA markets its program through D.M.A., Inc., an agency organized by two of ESBA's officers which receives 50% of first year member contributions and 17½% of contributions on renewal of the coverage. Administrative services are provided to ESBA by Benefit Services Corporation, a corporation organized by individuals with substantial ties to the organizers of ESBA. Benefit Services Corporation receives 22% of first year and renewal

member contributions as a fee for its services.

In Kansas ESBA has enrolled as members of its plan, individuals from a variety of occupations. For example, ESBA has enrolled a self-employed carpenter, an insurance agent, a domestic, a self-employed truck driver, a teacher's aide, a sewer department employee of a large city, a sole proprietor, and a contractor.

The two legal issues which we feel are of primary importance to the resolution of this dispute are: (1) What is the scope of the ERISA preemption? (2) Is ESBA's program "insurance" or an "employee benefit plan"?

## I. WHAT IS THE SCOPE OF THE ERISA PREEMPTION?

As the culmination of long investigation and study, Congress passed the Employee Retirement Income Security Act of 1974, P.L. 93–406, codified at 29 U.S.C. § 1001 *et seq.* ERISA was intended to make basic reforms in the area of employee pensions and other employee benefit programs.

■ Congress has the power, when it desires to exercise it, to occupy a field and, under the Supremacy Clause of the Constitution, preempt application of state law. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146–147, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

We believe that such intent is demonstrated by the wording of 29 U.S.C. § 1144:

(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

(b)(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

(2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

(B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

(3) Nothing in this section shall be construed to prohibit use by the Secretary of services or facilities of a State agency as permitted under section 1136 of this title.

(4) Subsection (a) of this section shall not apply to any generally applicable criminal law of a State.

(c) For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

(2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

(d) Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

Despite the apparently clear wording of § 1144(a), an examination of the legislative

history behind it may be helpful. We believe that the legislative history indicates that this wording was meant to convey just as broad a concept of preemption as appears on the face of the statute.

The original House and Senate versions of ERISA provided for preemption of state law. But the broader preemption provision which was eventually incorporated into ERISA was developed in conference committee.

The joint explanatory statement of the conference committee indicated just how broad the preemption provision was meant to be:

> *Preemption of State Laws (Sec. 514 of the bill)*
>
> Under the substitute, the provisions of title I are to supersede all State laws that relate to any employee benefit plan that is established by an employer engaged in or affecting interstate commerce or by an employee organization that represents employees engaged in or affecting interstate commerce. (However, following title I generally, preemption will not apply to government plans, church plans not electing under the vesting, etc., provisions, workmen's compensation plans, non-U.S. plans primarily for non resident aliens, and so-called "excess benefit plans.") [1974] U.S.Code Cong. & Admin. News, p. 5162.

In introducing the conference report, Senator Harrison Williams, Chairman of the Senate Committee on Labor and Public Welfare, made the following statement:

> It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law. [1974] U.S.Code Cong. & Admin. News, pp. 5188–89.

Senator Javits, ranking minority member of the Senate Committee on Labor and Welfare, explained the reasoning of the conference committee in broadening the preemption provision:

> Both House and Senate bills provided for preemption of State law, but—with one major exception appearing in the House bill—defined the perimeters of preemption in relation to the areas regulated by the bill. Such a formulation raised the possibility of endless litigation over the validity of State action that might impinge on Federal regulation, as well as opening the door to multiple and potentially conflicting State laws hastily contrived to deal with some particular aspect of private welfare or pension benefit plans not clearly connected to the Federal regulatory scheme.
>
> Although the desirability of further regulation—at either the State or Federal level—undoubtedly warrants further attention, on balance, the emergence of a comprehensive and pervasive Federal interest and the interests of uniformity with respect to interstate plans required—but for certain exceptions—the displacement of State action in the field of private employee benefit programs. The conferees—recognizing the dimensions of such a policy—also agreed to assign the Congressional Pension Task Force the responsibility of studying and evaluating preemption in connection with State authorities and reporting its findings to the Congress. If it is determined that the preemption policy devised has the effect of precluding essential legislation at either the State or Federal level, appropriate modifications can be made. 120 Cong.Rec. 29942 (1974).

The importance of the preemption provision was highlighted by Representative John Dent, Chairman of the Subcommittee on Labor of the House Committee on Labor and Education:

> Finally I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the

field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation.

. . . . .

The conferees, with the narrow exceptions specifically enumerated, applied this principle in its broadest sense to foreclose any non-Federal regulation of employee benefit plans. Thus, the provisions of section 514 would reach any rule, regulation, practice or decision of any State, subdivision thereof or any agency or instrumentality thereof—including any professional society or association operating under color of law—which would affect any employee benefit plan as described in section 4(a) and not exempt under section 4(b).

In light of this legislative history, we conclude that federal preemption in the area of pensions and other employee benefit programs is virtually total. We are unable to agree with the decisions which apparently have applied a narrow interpretation to § 1144. *See Insurers' Action Council, Inc. v. Heaton*, 423 F.Supp. 921 (D.Minn.1976); *Dawson v. Whaland*, No. 76–266 (D.N.H. 1976).

Rather, we subscribe to the view announced by the court in *Hewlett-Packard Company v. Barnes*, 425 F.Supp. 1294, 1300 (N.D.Cal.1977):

Overall, the legislative history reveals both that Congress carefully considered the question of preemption, including the feasibility of enacting a more limited preemption provision, and that Congress ultimately enacted Section 514(a) with the express purpose of summarily preempting state regulation of ERISA-covered employee benefit plans. That the statute, standing alone or buttressed by its legislative history, was intended to supersede state regulation of benefit plans such as plaintiffs' is indisputable.

*See also, Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 426 F.Supp. 316, 321 (N.D.Ind.1977); *Kerbow v. Kerbow*, 421 F.Supp. 1253, 1260 (N.D.Tex.1976); *Azzaro*

*v. Harnett*, 414 F.Supp. 473, 474 (S.D.N.Y. 1976); *aff'd* 553 F.2d 93 (2d Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 71, 54 L.Ed.2d 82; *White Motor Corp. v. Malone*, 412 F.Supp. 372, 380 n. 6 (D.Minn.), *rev'd on other grounds* 545 F.2d 599 (8th Cir. 1976); *Fleck v. Spannaus*, 412 F.Supp. 366, 368 (D.Minn.1976); Note, *Insurance Regulation—Employee Benefit Plans*, 28 Ark.L.Rev. 515, 520 (1975).

Our conclusion is bolstered by the recent statement of the House Committee on Education and Labor, which is charged with the responsibility of overseeing the implementation of ERISA:

ERISA, among its many provisions, provides for a significant adjustment in the regulatory roles of state and federal authority with respect to the various elements of the employee benefit plan field. The provisions of section 514 expressly reserve to Federal authority the regulation of employee benefit plans subject to the jurisdiction of the Act. In electing deliberately to preclude state authority over these plans, Congress acted to insure uniformity of regulation with respect to their activities. There was a recognition of the necessity for the preservation of some state activity in this field and certain limited exceptions were made to the broad preemption scheme. In general these exemptions are designed to save state law as it is applied to entities which are not employee benefit plans as defined in section 4(a) and not exempt under section 4(b), to the extent that such regulation does not relate to employee benefit plans.

From the early 1970's the legislative activities which eventually produced ERISA involved various framings of preemption schemes. The Committee's hearing record prior to 1974 contains numerous discussions of the propriety of one approach or another. Once it had become clear that our policy would be the creation of uniform national standards, the problem was to extract these plans from the regulatory schemes in the several states without creating untoward side effects.

A number of states had undertaken to regulate employee benefit plans as such; others had already made, or appeared ready to declare, these plans subject to state control as insurers, trust companies, or investment companies. From a drafting standpoint the difficulty arose in attempting to extricate these plans from the framework of state insurance, trust and securities regulation even though their activities might very well bring them within the sphere of conduct historically subject to such regulation. On the one hand it was clear that the plans subject to ERISA needed to be freed of the possibility of state regulation; on the other, it was important to limit the effects of preemption in order to avoid disrupting state efforts to regulate the conduct of other financial entities not subject to the federal Act.

This was accomplished by articulating a broad intention to preempt; "Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) and not exempt under section 4(b)" (ERISA section 514(a)

*It is our understanding of this language that with respect to regulation of the activities of certain employee benefit plans (those subject to ERISA jurisdiction), federal authority has been expressly extended to occupy the field to the exclusion of state authority subject to certain exceptions.* These exceptions are designed to delineate affirmatively the limits of the "field" preempted by section 514(a), and articulate a second, but distinctly subordinate, policy within the section of preserving state authority insofar as it does not relate to any plan ". . . described in section 4(a) and not exempt under section 4(b)."

Based on our examination of the effects of section 514, *it is our judgment that the legislative scheme of ERISA is sufficiently broad to leave no room for effective state regulation within the field preempted.* Similarly it is our belief that the Federal interest and the need for national uniformity are so great that enforcement of state regulation should be precluded. [ACTIVITY REPORT OF THE COMMITTEE ON EDUCATION AND LABOR OF THE U.S. HOUSE OF REPRESENTATIVES, House Report No. 94–1785, pp. 46–47 (1/3/77)] (emphasis added)

In sum, the preemption section of ERISA, 29 U.S.C. § 1144 (quoted above) clearly preempts all state regulation of "employee benefit plans". However, the law attempts to allow the states to continue to regulate other activities, such as the sale of insurance. § 1144(b)(2)(A). To preserve the distinction, ERISA also provides that a state cannot evade the preemption provision by treating an "employee benefit plan" as "insurance." § 1144(b)(2)(B). *See also Hewlett-Packard Company v. Barnes, supra,* 425 F.Supp. at 1300; *Dawson v. Whaland, supra.*

Accepting the broad preemption provisions of ERISA, we must now turn to the question of whether ESBA's program constitutes "insurance" (which may be regulated by state law) or an "employee benefit plan" (which may not be regulated by state law).

## II. IS ESBA'S PROGRAM "INSURANCE" OR AN "EMPLOYEE BENEFIT PLAN"?

As indicated in the previous section, under ERISA, Congress intended to prevent states from regulating in any manner "employee benefit plans". However, ERISA was not concerned with the regulation of insurance, *Dawson v. Whaland, supra,* and did not intend to preempt state laws in this regard. § 1144(b)(2)(A).

Plaintiff argues that ESBA's program is "insurance", which is still subject to state regulation as provided in § 1144(b)(2)(A). Defendant ESBA argues that its program is an "employee benefit plan" which, because of § 1144(a), may not be regulated by states.

The Supreme Court of Kansas has defined insurance, in *State ex rel. Londerholm v. Anderson*, 195 Kan. 649, 662, 408 P.2d 864, 874 (1965), as:

".  .  . any contract whereby one party promises for a consideration to indemnify the other against certain risks."

One author, after examining both statutes and case law, concluded that a good description of insurance would include five basic ingredients:

"(a) consideration (premium),

(b) fortuitous event,

(c) a group of people with identical interests more or less equally exposed to the same risks,

(d) a shifting of that risk to the insurer, and

(e) a distribution of the risk to others similarly exposed."

[Duesenberg, *The Legality of Noninsured Employee Benefit Programs*, 5 B.C.Ind. & Com.L.Rev. 231, 237 (1964)]

The complicating factor in evaluating defendants' program is the fact that most employee benefit plans will meet the criteria of a general definition of insurance. Goetz, *Regulation of Uninsured Employee Welfare Plans under State Insurance Laws*, 1967 Wis.L.Rev. 319, 322; Duesenberg, *supra*, 5 B.C.Ind. & Com.L.Rev. at 237.

Even before ERISA was passed, it was realized that the mere fact that employee benefit plans, or other activities, met the broad (and often vague) definitions of insurance, did not mean that such activities should be subject to regulation by state departments of insurance. As stated in Note, *Self-Insured Employee Welfare Plans and the 501(c)(9) Trust: The Specter of State Regulation*, 43 Cinn.L.Rev. 325, 333 (1974):

Although self-funded employee welfare plans may satisfy a vague legislative or judicial definition of insurance, it does not necessarily follow that employers providing such programs should be subject to supervision under insurance statutes.

*See also State ex rel. Londerholm v. Anderson, supra*, 195 Kan. at 662, 408 P.2d 864;

*West & Co. of La., Inc. v. Sykes*, 515 S.W.2d 635, 637 (Ark.1974); *Note, supra*, 28 Ark.L.Rev. at 516.

In *West & Co. of La., Inc. v. Sykes, supra*, 515 S.W.2d at 637, the court quoted a passage from an author who, after surveying the broad statutory definitions of insurance which States are prone to enacting, commented:

Arguably these statutes should be read not as stating that every transaction having the stated characteristics is insurance but only as saying that no transaction is insurance unless it has these characteristics. [Keeton Insurance Law—Basic Text, 8.–2(a), p. 543]

Given that most employee benefit plans meet standard definitions of insurance, and that Congress meant to preempt state regulation of employee benefit plans without otherwise affecting state regulation of insurance, how are we to tell exactly what Congress meant to preempt?

The Congressional definitions of "employee benefit plans" are set out in 29 U.S.C. § 1002:

For purposes of this subchapter:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

(2) The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was hereto-

fore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

> (A) provides retirement income to employees, or
>
> (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
>
> (3) The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.
>
> (4) The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

Defendants would have us conclude that ESBA is "any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan" under the last phrase of § 1002(4), and end the matter. However, we do not believe the solution is so simple.

■ Our conclusion is that just as a state cannot regulate an "employee benefit plan" by calling it "insurance", neither can defendants merchandise an insurance program, free of state regulation, by terming it an "employee benefit plan". Several factors lead to this conclusion.

First, a reading of the legislative history, including the Congressional hearings, leading up to the passage of ERISA, indicates that Congress was concerned primarily with pensions and other employee benefit programs established by employers, or unions.

Further, a reading of pre-ERISA literature sheds much light on how the concept "employee benefit plan" was generally understood. Such a reading indicates that the pre-ERISA concept of an "employee benefit plan" was easily distinguished from the concept of "insurance", and was based on the premise that most "employee benefit plans" were non-profit, non-advertising, and provided by employers, or pre-existing employee groups.

One pre-ERISA discussion of "employee benefit plans" (EBPs) is located in Note, *supra,* 28 Ark.L.Rev. at 515. That article proffers the following definition of EBPs, while noting that the definition is more limited than that set out in ERISA:

> Employee benefit plans are arrangements through which employees are provided hospital, surgical, death, and disability benefits as a fringe benefit by the employer.

The article continues by discussing the early relief funds for employees established by railroad companies, and noting that they were distinguished from insurance by the following factors:

> . . . first, the funds were not open to the public; second, there was no advertising or solicitation; third, the membership was voluntary; and fourth, the fund was not operated for profit.

The Note addressed the decision of *West & Co. of La., Inc. v. Sykes, supra,* in which the Arkansas Supreme Court concluded that an employer's employee benefit plan was not subject to regulation by the Arkansas insurance authorities. At page 518, the article notes:

> In deciding that the West Plan was not insurance, the Court cited several characteristics of the plan which distinguished it from insurance. The characteristics were: first, the plan was a fringe benefit; second, it was furnished on an optional basis; third, it was substantially

supported by the employer's profits; and fourth, the plan is not intended to be actuarially sound.

Finally, and perhaps most important, the articles note that the primary purposes of insurance regulation simply are not advanced by the regulation of EBPs. These objectives were stated to be:

.   .   .   first, to avoid overreaching by insurers; second, to assure solidity and solvency of insurers; third, to assure that rating classifications and rates are reasonable and fair. Even though not discussed by the Court, it is clear that none of these objectives would be served by the regulation of employee benefit plans. .   .   .   There is no threat of overreaching when the given plan is provided on a non-profit basis. Any unfairness by the employer in paying out benefits would probably result in labor problems. Statutory reserve requirements would also be unnecessary since the benefit plan would only be incidental to the employer's business. Payment of benefits would normally be no more uncertain than payment of wages. Finally, since benefit plans are provided at less cost than comparable plans offered by insurers, there would be no reason for rate regulation. [28 Ark.L.Rev. at 517–518]

Another such discussion of EBPs in relation to insurance appears in Duesenberg, *supra*, 5 B.C.Ind. & Com.L.Rev. That article concludes that the "primary purpose test", which has been recognized in Kansas, *State ex rel. Londerholm v. Anderson, supra*, 195 Kan. at 662, 408 P.2d 864, easily distinguishes EBPs from insurance.

First, of course, is the proposition that programs of this kind are nothing more than incidents of the employment contract by which an employer hopes to get better services from its employees. They are a form of compensation. .   .   .

.   .   .   .   .

Marketing practices are a second major distinction. They are substantially different from those normally used in selling insurance, and these dissimilarities serve to minimize the need for state regulation.

Two characteristics of the programs stand out. Protection available through employee benefit plans is neither offered to the public generally nor marketed for profit. .   .   .

.   .   .   .   .

Noninsured employee benefit programs may be further distinguished from insurance by the inadequacy or total absence [pp. 238–240]

An important point made by Duesenberg is that while state regulation can serve to keep an insurance company solvent, no such regulation can competently protect the economic prosperity of an employer.

In Note, 43 Cinn.L.Rev., *supra*, at 334–335, it is observed that the authorities generally distinguish EBPs from insurance on these bases: (a) the employer-employee (rather than insurance company-customer) relationship; (b) the absence of a profit motive; (c) the absence of solicitation; and (d) the absence of the common reasons for insurance regulation.

Another helpful discussion of the problem, which will not be expanded upon here, appears in *Goetz*, 1967 Wis.L.Rev., *supra*, at 336–341.

Post-ERISA Congressional Reports bear out that these characterizations of EBPs are substantially what Congress had in mind when it passed ERISA. *See* Activity Report of the Committee on Education and Labor of the U. S. House of Representatives, House Report No. 94–1785 (1976).

Clearly, the EBP concept as it existed when Congress passed the preemption provisions of ERISA involved the following characteristics: (1) it was provided by an employer or homogeneous employee organization, such as a union; (b) it was non-commercial in nature; (c) it did not involve solicitation; (d) it was not intended to be actuarially sound; (e) because the employees could look only to the fund, and not to the provider of that fund, the rates were substantially lower than insurance rates. (Compare with Dept. of Labor press release,

May 2, 1977.) While it is obvious from § 1002(4) that Congress intended to give as broad a definition as possible to EBPs, it is also clear that it did not intend to allow companies, motivated by profit, to escape insurance regulations by setting up a program that is an EBP in name only.

◼ Judged by the standards discussed, we believe that it is clear that ESBA's program is "insurance" and not an EBP. ESBA's program is provided by a third-party entrepreneur, not an employer or a pre-existing employee group, such as a union. When an individual purchases a plan from ESBA, neither his employer nor any of his co-employees (if any) even know about it. The ESBA plan is certainly not non-commercial; its operation provides profit-making opportunities for its marketing agency (D.M.A., Inc.) and its administrative services provider (Benefit Services Corp.), both of which have substantial ties to ESBA's organizers. ESBA's plan is apparently supposed to be actuarially sound. The evidence before the Court indicates that ESBA's rates are somewhat lower than normal insurance rates. ESBA's marketing practices are virtually indistinguishable from those of an insurance company.

We believe that this description indicates that the characteristics of ESBA's plan put it within the definition of "insurance" and outside the traditional concept of an EBP. Just as important, having examined ESBA's operation the Court can see no reason to conclude that the objectives of insurance regulation would not be well-served by application to ESBA's program. Evidence of the recent failure of similar companies attest to the need for regulation in this area.

From an examination of the broad concept of EBPs, it is our conclusion that ESBA is marketing disguised insurance. We are not alone in this conclusion. The House Activity Report, *supra*, remarked:

It has come to our attention, through the good offices of the National Association of State Insurance Commissioners, that certain entrepreneurs have undertaken to market insurance products to employers and employees at large, claiming these products to be ERISA covered plans. For instance, persons whose primary interest is in profiting from the provision of administrative services are establishing insurance companies and related enterprises. The entrepreneur will then argue that his enterprise is an ERISA benefit plan which is protected, under ERISA's preemption provision, from state regulation. We are concerned with this type of development, but on the basis of the facts provided us, we are of the opinion that these programs are not "employee benefit plans" as defined in Section 3(3). As described to us, these plans are established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others. They are not established or maintained by the appropriate parties to confer ERISA jurisdiction, nor is the purpose for their establishment or maintenance appropriate to meet the jurisdictional prerequisites of the Act. They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan. (p. 48)

We do not believe that the importance of this statement of the House Committee charged with overseeing the operation of ERISA can be minimized. In a recent and similar case, *Hamberlin v. VIP Insurance Trust*, 434 F.Supp. 1196 (D.Ariz.1977), the Court quoted from this Activity Report and noted:

While not contemporaneous legislative history, it is "virtually conclusive" as to legislative intent. *Sioux Tribe v. United States*, 316 U.S. 317, 319 (1942), 62 S.Ct. 1095, 86 L.Ed. 1501.

An examination of the specific wording of the ERISA provisions also leads us to the conclusion that ESBA's activities are not protected by the preemption provisions of ERISA because ESBA's program is not an employee benefit plan.

The term "employee benefit plan" is defined in 29 U.S.C. § 1002(3) as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both

. . ." Thus, if ESBA's plan is to constitute a protected EBP, it must meet the definition of an "employee welfare benefit plan" which is defined in § 1002(1):

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

Plaintiff concedes that ESBA's program meets the second portion of this definition because the ESBA plan does provide "medical, surgical, or hospital care or benefits", etc. However, plaintiff argues that ESBA's program is not an EBP because it is not "established or maintained by an employer or by an employee organization".

■ We have no difficulty in concluding that ESBA is certainly not an "employer". That term is defined in § 1002(5):

(5) The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

ESBA does not employ the individuals which purchase its medical care or death benefits coverage. ESBA does not act directly as, or indirectly for the benefit of, the employer of the individuals who purchase an ESBA plan.

In *Hamberlin v. VIP Insurance Trust, supra,* the original VIP trust was a multiple employer trust insured by Old Republic Life Insurance Company. When Old Republic cancelled the group coverage, the insurance brokers, Galbraith & Green, established a new self-funded trust rather than finding another authorized insurer. The trustees were Galbraith & Green officials. Galbraith & Green sold the policies, as does ESBA, directly to individual employees who paid the entire premiums on their individual insurance policies. The Court rejected a contention that the trustees were acting as agents of employers as contemplated by 29 U.S.C. § 1002(5), noting:

The employers had no voice in the management or operation of the trust or the decision to terminate, and contributed no funds on behalf of their employees. The trustees were corporate officers of Galbraith & Green and in the operation, maintenance and ultimate termination of the plan were acting in the best and primary interest of their corporate employer. They were simply not acting as agents of or on behalf of the employers or employer groups as contemplated by 29 U.S.C. § 1002(5). They were acting in the interest of and on behalf of the business of Galbraith & Green, their employer.

This was purely an entrepreneurial plan put together by Galbraith & Green to protect business commissions they would have lost if the trust had not been restructured and continued after Old Republic cancelled. They also maintained business relations with customers they could have lost. Most importantly, by designating this an ERISA plan, they hoped to escape from direct supervision and auditing by the State Insurance Department and from its coverage and reserve requirements under the theory of federal preemption.

We think it clear that ESBA is not an employer or one acting in the interest of an employer as contemplated in § 1002(5).

A better argument might be made that ESBA constitutes an "employee organization", a term which is defined in § 1002(4):

The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

Thus, the term "employee organization" is defined in two parts. Clearly the ESBA plan does not constitute an "employee organization" as that term is defined in the portion of subsection (4) which precedes the semi-colon. For a program to meet this definition, it must be a program in which "employees participate" and the organization must exist "for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships."

The participation requirement of this definition is not met by ESBA. ESBA is a mere third party entrepreneur; it is not a part of any genuine employee organization. The only pretense which ESBA puts forth concerning employee participation is the provision that employees may attend, and vote at, the annual meeting. However, individuals who purchase an ESBA policy must sign a proxy appointing an ESBA official as their representative at the meeting should they not attend. In April, 1977, an annual meeting was held. Of the 3500 ESBA policyholders, none attended the annual meeting. Employee participation in the ESBA plan is a fiction.

Nor does ESBA exist for the purpose of dealing with employers concerning an employee benefit plan. There is no evidence in this case indicating that the employer of an individual who purchases an ESBA policy would have any knowledge whatsoever of ESBA. The employer of an individual who purchases an ESBA policy will in most instances no more deal with ESBA than he would deal with an insurance company which had sold a medical coverage policy to the employee. Contributions may be paid to ESBA without employer involvement, and claims and benefits are administered without any participation by the employer.

Therefore, if ESBA is to receive any comfort from this section, it must meet the requirements of the definition of an "employee organization" which is contained in the portion of § 1002(4) which follows the semi-colon. This portion of the definition is very broad, indicating that an "employee organization" can be "*any* employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan." In point of fact, the Court finds this definition to be of very little help. This clause defines "employee organization" in terms of the plan provided. But if one looks to the definition of plan contained in § 1002(1), that term is defined, in significant part, in terms of who provides the plan. Thus, we face a circular definition. A plan is an EBP if it meets certain requirements *and* is provided by an employee organization. An entity is an employee organization if it is organized to provide an EBP. Because of the circularity of this definitional process, we believe that it is only the first section of § 1002(4)—before the semi-colon—which can be safely looked to for a useful definition of "employee organization". As noted, ESBA does not meet that definition.

Despite our reservations about the circularity of definition contained in the last clause of § 1002(4), we believe that it must be analyzed, because principles of statutory construction teach that statutes should be construed in such a way as to render none of the subsections superfluous. *Stamps v. Michigan Teamsters Joint Council No. 43*, 431 F.Supp. 745 (E.D.Mich.1977). Analysis of this clause must center on the definition of its key phrase "employees' beneficiary association."

We believe that there are a number of indications that the essential ingredient of an "employees' beneficiary association" is a commonality of interests among its employee members.

The term "employees' beneficiary association" was used in ERISA's predecessor, the Welfare and Pension Plans Disclosure Act, as amended by the Welfare and Pension Plans Disclosure Act Amendments of 1962, 29 U.S.C. § 302(a)(3) (repealed effective January 1, 1975). In 1965, the Department of Labor published *The Welfare and Pension Plans Disclosure Act Interpretive Manual*, which defined the term "employees' beneficiary association" as follows:

315.100 CRITERIA FOR DISTINGUISHING EMPLOYEES BENEFICIARY ASSOCIATIONS

The term "employees' beneficiary association" is not defined by the Act. An analysis of the Act has led to the development of certain criteria for determining whether an organization is an "employees' beneficiary association" within the meaning of the Act:

1) The membership in the association must be conditioned on one's employment status.

Examples:

(a) Membership is limited to employees of a certain employer or employers, or

(b) All members must be members of one union. Membership is tied to the union which itself is formed and maintained in large part to deal with employment relationships.

Where membership in an organization is based solely on national origin, geography, religious affiliation, or fraternal, civic, or social purposes, etc. and the employment status of the members is irrelevant, such organizations would not be employees' beneficiary associations. Examples of such organizations are the Knights of Columbus, the Elks, the Kiwanis, Rotary, Junior Chamber of Commerce, and Club of Irish-Americans. Thus, plans maintained by such organizations would not be within the scope of the WPPDA.

The importance of this construction of the term "employees' beneficiary association" is clear when it is realized that Congress, presumably aware of this interpretation [*National Lead Co. v. United States*, 252 U.S. 140, 145–146, 40 S.Ct. 237, 64 L.Ed. 496 (1920); *Helvering v. Winmill*, 305 U.S. 79, 82–83, 59 S.Ct. 45, 83 L.Ed. 52 (1938)], utilized in ERISA substantially the same definitions which had been contained in the WPPDA at 29 U.S.C. § 302. 2A Sutherland on Statutory Construction § 49.09, at 256 (4th ed. 1973) states:

Where a statute has received a contemporaneous and practical interpretation and the statute as interpreted is reenacted, the practical interpretation is accorded greater weight than it ordinarily receives, and is regarded as presumptively the correct interpretation of the law.

*See also Snyder v. Harris*, 394 U.S. 332, 339, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *Brewster v. Gage*, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930); *State of Wyoming v. United States*, 310 F.2d 566, 580 (10th Cir. 1962).

The term "employees' beneficiary association" also appears in the Internal Revenue Code, 26 U.S.C. § 501(c)(9). Again we find that interpretation of this term highlights the concept of commonality of interests among employee members. In Proposed Regulation 1.501(c)(9)–1 which appears at 34 Fed.Reg. 1028 (1/23/69), we find the following:

An organization defined in section 501(c)(9) must be composed of individuals who are entitled to participate in the association by reason of their status as employees who are members of a common working unit. The members of a common working unit include, for example, the employees of a single employer, the employees of one industry, or the members of one labor union. Although membership in such an association need not be offered to all of the employees of a common working unit, membership must be offered to all of the employees of one or more classes of the common working unit, and such class or classes must be selected on the basis of criteria which do not limit membership to shareholders, highly compensated employees, or other like individuals. The criteria for defining a class may be restricted by conditions reasonably related to employment, such as, a

limitation based on a reasonable minimum period of service, a limitation based on a maximum compensation, or a requirement that a member be employed on a full-time basis. The criteria for defining a class may also be restricted by conditions relating to the type and amount of benefits offered, such as, a requirement that a member meet a reasonable minimum health standard in order to be eligible for life, sick, or accident benefits.

Defendants appear to have realized the significance of the commonality requirement for an employee beneficiary association, for the ESBA by-laws, Article II, Sec. 1, define the term "common work unit" as including "all of the employees of the same employer, or all of the employees of any one industry or profession, or all of the members of a labor union."

█ In actual practice, the evidence indicates that ESBA largely ignores the commonality requirement and its own definition of "common work unit". In fact, defendant Tresham testified that he was not sure what the phrase "common work unit" meant. (Tresham Depo., pp. 23–24) ESBA does not limit membership to one employer, one industry, or one union. Rather, ESBA will sell its program to virtually anyone who is employed. It is therefore impossible to conclude that ESBA is an "employees' beneficiary association" as that term is used in the last clause of § 1002(4).

█ Another way in which to examine ESBA's program in relation to ERISA is to begin with the definition of "employee" in § 1002(6):

The term "employee" means any individual employed by an employer.

For purposes of ERISA, as noted earlier, § 1002(5) indicates that to be an employer one must act "in relation to an employee benefit plan". Thus, an individual would be an "employee" only if he worked for an entity which acted "in relation to an employee benefit plan." It has already been concluded that the employers of the individuals who have purchased ESBA's policies do not, in fact, act in relation to the EBP. Therefore, these policyholders are not "employees" within the meaning of ERISA.

█ ESBA's selling of plans to self-employed individuals is obviously contrary to ERISA for it is clear that one who is self-employed with no common law employees cannot establish a qualified plan. 29 C.F.R. § 2510.3–3 (1976).

We thus find nothing in the wording of the ERISA definitions which would indicate that ESBA's program is any more deserving of the preemption protection of 29 U.S.C. § 1144 than would be any other insurance company selling medical care benefits to working individuals. It is clear that under 29 U.S.C. § 1144(b)(2)(A), ESBA's activities were not meant to be exempted from state regulation under ERISA. To allow ESBA to palm its insurance program off as an EBP by the use of transparent gimmickry would completely destroy the distinction between insurance and employee benefit plans which 29 U.S.C. § 1144 obviously attempts to preserve. Any other decision would certainly be contrary to the policy underlying the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.* which reserves for the various states the regulation of the industry of insurance.

IT IS THEREFORE DECLARED that the "plan" ESBA is soliciting is not an "employee welfare benefit plan", as that term is defined in 29 U.S.C. § 1002;

IT IS FURTHER DECLARED that ESBA is subject to the insurance laws of the State of Kansas and to the regulations of the Kansas Insurance Commissioner;

IT IS ORDERED that defendants, and their officers, employees, agents or servants be, and are hereby, permanently enjoined from transacting any insurance business in the State of Kansas until such time as they become properly authorized to do so.