**BLUE CROSS AND BLUE SHIELD OF ALABAMA, a non-profit corporation, Plaintiff,**

v.

**PEACOCK'S APOTHECARY, INC., a corporation, et al., Defendants.**

**Civ. A. No. CV81–PT–1012–S.**

United States District Court, N.D. Alabama, S.D.

July 13, 1983.

---

**9.** See note 6, supra.

# 1261

Charles C. Pinckney, William G. Somerville, Jr., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiff.

Charles A. Graddick, Atty. Gen., H. William Wasden, Algert S. Agricola, Jr., Montgomery, Ala., for defendants, Alabama Bd. of Pharmacy and Bd. Members.

Ed Hill, pro se on behalf of himself and Peacock's Apothecary.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes on to be heard on defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, filed on February 10, 1983, and plaintiff's Motion for Summary Judgment, filed on March 15, 1983. Plaintiff and defendants have represented to the court that there are no factual disputes and that the case is proper for summary judgment, one way or another.

### Facts

Blue Cross and Blue Shield of Alabama (hereinafter Blue Cross), plaintiff in this action, provides prescription drug benefits to fifty-one employer groups, pursuant to third party prescription programs that utilize participating pharmacy agreements. In summary, individuals who are a part of these employer groups go to "participating pharmacies" to get their prescription drugs under these third party prescription programs. The individual buying the drug pays only a small amount (a "co-payment") for each prescription. The pharmacist is reimbursed by Blue Cross for the balance of the prescription price.[1] Blue Cross is then reimbursed by the employer of the individual. Thus, the individual buys prescriptions at a reduced price through the third party prescription program.

Blue Cross provides these prescription drug benefits under third party prescription programs utilizing participating pharmacy agreements only to these fifty-one employer groups. Blue Cross does not provide any such prescription drug benefits under third party programs utilizing participating pharmacy agreements under any contracts or policies with individual subscribers or with any entities or persons other than those fifty-one employer groups.

Regarding all fifty-one employer groups, those benefits are provided as part of employee benefit plans established by the employers to provide health care benefits to their employees either through contracts of the employers with other Blue Cross plans in other states (with Blue Cross of Alabama

---

1. The primary dispute in this lawsuit involves the manner of calculating the prescription price.

serving as a participating plan in providing such benefits to the Alabama employees of such employers) or through contracts of the employers directly with Blue Cross of Alabama. In most if not all cases, those benefit plans, including such plans embracing prescription drug benefits, are established and maintained by employers in fulfillment of requirements of collective bargaining agreements with unions.

The fifty-one employer groups are composed of 4,812 employees. These employees, together with their family members, total 15,162 individuals. Approximately 80% of the 4,812 employees work in Alabama for Ford Motor Company and Chrysler Corporation. The Alabama employees of Ford and Chrysler, together with the Alabama retirees of General Motors Corporation, are covered under the "Auto National Account Program," under which the three motor companies contract pursuant to collective bargaining agreements with Blue Cross and Blue Shield of Michigan for provision of health care benefits to the employees of the motor companies, and Blue Cross and Blue Shield of Michigan in turn contracts (also pursuant to the collective bargaining agreements) with Blue Cross of Alabama and other local Blue Cross plans for provision of those benefits to the employees located in states outside of Michigan.

The concept of prescription drug benefits under third party prescription programs utilizing participating pharmacy agreements originated in collective bargaining negotiations between the United Auto Workers (UAW) and Ford Motor Company in 1967. An integral part of the prescription drug benefit plan that evolved in the 1967 collective bargaining negotiations was the use of participating pharmacy agreements: reimbursements to the pharmacies by Blue Cross would be based on the pharmacies' drug acquisition costs plus a dispensing fee. The prescription drug benefit plan was included in the Insurance Program, which was part of 1967 Ford collective bargaining agreement.

The Insurance Program required that prescription drugs expense benefits be provided, as set forth in Exhibit I thereof, in Michigan, and that the same benefits be provided to employees outside of Michigan on a uniform basis under a "National Account Program." The National Account Program for provision of such benefits to employees outside of Michigan was required to be implemented through use of a Master Group Operating Agreement between Ford and Blue Cross of Michigan, designated as the "Control Plan." The Control Plan was required to enter into participating plan agreements with local Blue Cross plans, such as Blue Cross of Alabama, for provision of these prescription drug benefits to Ford employees in Alabama and other states outside of Michigan. To guarantee that the health care benefit plan under the National Account Program would be uniform in states outside of Michigan in which it was administered, the 1967 Ford bargaining agreement required that Blue Cross of Michigan develop "Administrative Manuals," with the approval of the UAW and Ford, "for use by all participating local plans" to govern the benefits provided and reimbursement to providers in all states in which the benefits were administered. Exhibit I to the Insurance Program provides that participating providers will be paid "Prescription Charges," and defines "Prescription Charges" as "the acquisition cost of the drugs . . . plus a Dispensing Fee." "Dispensing Fee" is defined as "a fee predetermined by the Plan for dispensing drugs as provided for in this program."

The collective bargaining agreements entered into in 1967 by the UAW with General Motors and Chrysler contained virtually the same provisions as the above-described provisions in the Ford bargaining agreement. Pursuant to those bargaining agreements, Ford, Chrysler, and General Motors in 1968 each entered into a National Account Program Master Group Operating Agreement with Blue Cross and Blue Shield of Michigan, and Michigan Blue Cross and Blue Shield in 1968 entered into National

Account Program Participating Plan Agreements with Blue Cross and Blue Shield of Alabama and other local participating plans.

The prescription drug benefit program as originally conceived and incorporated in the 1967 collective bargaining agreements has been readopted with no appreciable change in each of the successive collective bargaining agreements between the UAW and the motor companies to the present time.

The present collective bargaining agreements of the motor companies continue to require the development by the Michigan Plan, with approval of the UAW and the companies, of an Administrative Manual to govern participating local plans, such as Blue Cross of Alabama, to assure uniformity in the administration of the benefit plan in all states. The current Administrative Manual developed accordingly to govern and assure uniformity in local administration by the participating plans, including Blue Cross of Alabama, requires that reimbursement of participating pharmacies be on the basis of the drug acquisition cost plus the dispensing fee in an amount predetermined by a local plan (such as Blue Cross of Alabama).[2]

Of the remaining employer groups, four are covered under National Account Programs for which Blue Cross of Alabama is the participating local plan: Mack Trucks, Inc., with Blue Cross of Lehigh Valley, Allentown, Pennsylvania, as the Control Plan;

Valeron Corporation, with Blue Cross and Blue Shield of Michigan as the Control Plan; Heil Company with Blue Cross and Blue Shield United of Wisconsin as the Control Plan; and Roberts Corporation, with Blue Cross and Blue Shield United of Wisconsin as the Control Plan. The remainder of the fifty-one employer groups in Alabama, for which Blue Cross of Alabama provides prescription drug benefits, are small plans established by employers, located in Alabama, who employ members of the United Mine Workers (UMW). These employers have established the plans pursuant to the requirements of the Bituminous Coal Wage Agreements of 1978 and 1981, which are collective bargaining agreements between the UMW and employers in the coal mining industry.

Blue Cross of Alabama has participating pharmacy agreements with 627 pharmacies in Alabama. These agreements provide that Blue Cross will reimburse these pharmacies for acquisition cost plus the dispensing fee[3] as determined by Blue Cross of Alabama as the "Local Plan." Thus, the reimbursement terms of these pharmacy agreements are consistent with those of the Auto National Account Program Administrative Manual.

The Third Party Prescription Program Act (the Pharmacy Act or the Act), which became effective on June 27, 1981, provides:

§ 34–23–110. Short title.

This article shall be known and may be cited as the "Third Party Prescription Program Act."

---

2. The current Administrative Manual requires the Local Plan to make the payment to "Participating Providers" in the "Local Plan Area." The Manual provides the following regarding payments: "1. Participating Provider: A Local Plan will pay to a Participating Provider the Prescription Charge for each covered drug less the co-payment amount of $3.00." The Manual defines "Prescription Charge" as follows: "For a Participating Provider, Prescription Charge means the Acquisition Cost plus the Dispensing Fee for a Covered Drug except injectible insulin." "Acquisition Cost" is also defined in the Manual: "The actual invoice cost of a drug (with the exception of cash discounts, but including trade discounts) to the Provider or to the company, organization or its affiliates with

which the Provider is associated whichever is less." The Manual defines "Dispensing Fee" as "[a]n amount or amounts predetermined by a Local Plan to compensate Participating Providers for dispensing Covered Drugs." Finally, "Participating Provider" is defined in the Manual as "[a] Provider who has entered into a Participating Contract with a Local Plan to provide a Covered Drug at cost to a member not to exceed the Co-Payment Amount of $3.00."

3. The present dispensing fee as determined by Blue Cross of Alabama is $2.95 per prescription.

**§ 34–23–111. "Third party prescription program" defined.**

As used in this article, the term "third party prescription program" shall mean any system of providing for the reimbursement of pharmaceutical services under a contractual arrangement or agreement between a provider of such services and another party who is not the consumer of those services. Such programs may include, but not be limited to, employee benefit plans whereby a consumer receives prescription drugs or other pharmaceutical services and those services are paid for by an agent of the employer or others.

**§ 34–23–112. Required contractual provisions.**

Any agreement or contract entered into in this state between the program administrator of a third party program and a pharmacy shall include a statement of the method and amount of reimbursement to the pharmacy for services rendered to persons enrolled in the program, the frequency of payment by the program administrator to the pharmacy for such services rendered, and a method for the adjudication of complaints or the settlement of disputes between the parties.

**§ 34–23–113. Cancellation of program; use of identity card after cancellation.**

(a) The administrator of a program shall notify all pharmacies enrolled in said program of any cancellation of coverage of benefits of any group enrolled in the program at least 30 days prior to the effective date of such cancellation.

(b) All persons enrolled in a program shall be notified of its cancellation, and the administrator of the program shall make every reasonable effort to gain possession of any plan identification cards such persons may have been issued pursuant to the provisions of the program.

(c) Any person who utilizes a program identification card to obtain services from a pharmacy after having received notice of the cancellation of his benefits shall be liable to the program administrator for all money paid by the program administrator for any services received pursuant to the illegal use of said identification card.

**§ 34–23–114. Denial of payment.**

(a) No program administrator shall deny payment for services to any pharmacy which may have resulted from the fraudulent or illegal use of any identification card by any person unless the pharmacy has been notified that the card has been canceled or discontinued and that the program administrator has been unsuccessful in attempting to regain possession of the card.

(b) No program administrator shall withhold any payments to any pharmacy beyond the time period specified in the payment schedule provisions of the agreement, except that individual claims for payment may be returned to the pharmacy for reasons such as incomplete or illegible information and may then be resubmitted by the pharmacy to the program administrator after appropriate corrections have been made.

**§ 34–23–115. Reimbursement rates.**

No agreement between a program administrator and a pharmacy shall establish reimbursement rates or procedures that result in reimbursement rates for services rendered to persons covered by the plan which are less than the usual and customary rates paid by consumers not covered by a third party plan for the same or similar services.

**§ 34–23–116. Article not applicable to medicaid services.**

This article shall not apply to any services rendered pursuant to provisions of the Alabama medicaid program.

**§ 34–23–117. No programs to be instituted until notice given.**

After June 27, 1981, no third party prescription programs shall be instituted in this state unless:

(1) The program administrator has given written notice of the provisions

of the particular program to all pharmacies in this state as defined in section 34–23–1.

(2) All pharmacies in this state as defined by section 34–23–1 have had 30 days from the date of said notice to enroll in that particular program.

*§ 34–23–118. Compliance with article required of all programs.*

After June 27, 1981, no third party prescription programs shall be instituted, nor shall existing agreement or contract be renewed unless they are in compliance with the provisions of this article.

Ala.Code §§ 34–23–110–118 (Supp.1982).

The State Board of Pharmacy has not made any attempts to enforce the Act. Since the Act became effective, however, defendants Peacock's Apothecary and Ed Hill have sought reimbursement from Blue Cross based on the "usual and customary rates" language of the Act, instead of the standard of "acquisition cost plus dispensing fee," which is stated in the various pharmacy agreements and employee benefit plans.

### Contentions of the Parties

Plaintiff challenges the validity of the Act under several theories. First, plaintiff claims that the Act is void under the Supremacy Clause of the United States Constitution because the Act is preempted by ERISA (29 U.S.C. § 1144). Second, plaintiff argues that the Act is invalid under the

Commerce Clause of the United States Constitution because it impermissibly burdens interstate commerce. Third, plaintiff contends that the Act is void under the Supremacy Clause of the United States Constitution because it is preempted by the Sherman Act. Fourth, plaintiff claims that the Act is invalid under the Due Process Clause of the United States and Alabama Constitutions and exceeds the police power of the Alabama legislature. Lastly, plaintiff contends that application of the Act to existing contracts and programs violates the Contracts Clause of the United States Constitution.

Defendants argue in response that this court does not have subject matter jurisdiction over these claims. Defendants also have stated responsive arguments to each of the plaintiff's claims. Because defendants have made a number of contentions, the court will not enunciate and address these contentions until the court reaches the merits of plaintiff's claims.

### Jurisdiction

Plaintiff claims that the court has jurisdiction under 29 U.S.C. § 1132(a)(3)[4] because plaintiff is a "fiduciary," as defined in 29 U.S.C. § 1002(21).[5] In support of its claim of fiduciary status, plaintiff points to 29 C.F.R. § 2560.503–1(g)(2), which provides the circumstances under which an insurance company can be a fiduciary under ERISA.[6] Plaintiff claims that it qualifies under this regulation as a fiduciary because

---

**4.** Section 1132(a)(3) provides as follows:

(a) A civil action may be brought—
(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; ...

29 U.S.C.A. § 1132(a)(3) (1975).

**5.** Section 1002(21) states in pertinent part:

(21)(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he

exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . .

29 U.S.C.A. § 1002(21)(A) (1975 & Supp.1983).

**6.** That regulation states as follows:

(2) To the extent that benefits under an employee benefit plan are provided or admin-

plaintiff, pursuant to the employer groups' employee benefit plans, has the authority to review and make decisions regarding claim denials. E. Gene Thrasher, Vice President of the Marketing Group for Blue Cross of Alabama, states the following in his affidavit:

> 10. Under each of the foregoing employee health benefit plans, Blue Cross of Alabama has the responsibility and authority, as to the claims of employees located in Alabama, for the review and determination of denied claims, and Blue Cross of Alabama has discretionary authority in making final decisions on review and determination of all claim denials.

Plaintiff cites this court to Judge Pointer's decision in *Austin v. General American Life Insurance Co.,* 498 F.Supp. 844 (N.D.Ala. 1980), as additional support for its claim of fiduciary status pursuant to 29 C.F.R. § 2560.503–1(g)(2). Judge Pointer ruled in *Austin* that the defendant insurance company, asserting ERISA jurisdiction, improperly removed the case from state court, because it was not a fiduciary under ERISA.

> General American claims in its brief, without evidence, that it is to be considered as a fiduciary of the plan within the meaning of 29 C.F.R. § 2560.-5021(g)(2).... The cited regulation states in substance that, where benefits under an ERISA plan are provided or administered by an insurance company, the plan may specify that such company be responsible for review of decisions or denied benefit claims, in which event the insurer will be treated as an ERISA fiduciary. The language of the regulation

demonstrates that the insurance company is not necessarily a fiduciary by reason of providing contractual benefits, but rather is to be considered if it, in addition, is given responsibility for reviewing *denied* claims. Not every insurer is a fiduciary for the purposes of ERISA; nor is it the case that merely by deciding whether to pay claims submitted by insureds the insurer is thereby subjected to the responsibilities of a fiduciary. The regulation relied on by General American makes it clear that the status of an insurer as a fiduciary is not automatic but rather turns upon the provisions of the plan and of the agreement made by the insurer.

> The defendants present no evidence to the effect that General American is charged with review of denied claims or is otherwise accountable as a fiduciary under ERISA.... [T]he case is due to be remanded.

*Austin v. General American Life Insurance Co.,* 498 F.Supp. at 846. In the case at bar, of course, plaintiff has established that it does have the authority under the employee benefit plans to review and determine the resolution of denied claims.

In a brief submitted prior to plaintiff's brief, defendants argue that plaintiff is not a fiduciary because it has averred no facts in support of that status, pursuant to the *Austin* decision. Plaintiff's brief and Thrasher's affidavit, of course, dispute this argument of defendants. Defendants subsequently made no attempt to rebut plaintiff's proof that it has authority to review and make decisions regarding denied claims. This question may be moot, however, in view of the court's position on jurisdiction

---

istered by an insurance company, insurance service, or other similar organization which is subject to regulation under the insurance laws of one or more States, the claims procedure pertaining to such benefits may provide for review of and decision upon denied claims by such company, service or organization. *In such case, that company, service, or organization shall be the "appropriate named fiduciary" for purposes of this section.* In all other cases, the "appropriate named fiduci-

ary" for purposes of this section may be the plan administrator or any other person designated by the plan, provided that such plan administrator or other person is either named in the plan instrument or is identified pursuant to a procedure set forth in the plan as the person who reviews and makes decisions on claim denials.

29 C.F.R. § 2560.503–1(g)(2) (1982) (emphasis added).

under 28 U.S.C. § 1331, as discussed later in this Memorandum Opinion.

■ Defendants also argue that the court does not have jurisdiction under ERISA because the participating pharmacy agreements between plaintiff and the pharmacies do not constitute "employee benefit plans" within the meaning of 29 U.S.C. § 1003(a) and 29 U.S.C. § 1144. An "employee benefit plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C.A. § 1002(3) (1975 and Supp.1983). An employee welfare benefit plan is defined as follows:

> any plan, fund, or program which has heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C.A. § 1002(1) (1975 & Supp.1983). The Eleventh Circuit recently provided a definition for an ERISA employee welfare benefit plan:

In summary, a "plan, fund, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. To be an *employee* welfare benefit plan, the intended benefits must be health, accident, death, disability, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits; the intended beneficiaries must include union members, employees, former employees or their beneficiaries; and an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, must establish or maintain the plan, fund, or program.

*Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982). The benefit plans created and maintained by the fifty-one employers in this case clearly fit the *Dillingham* definition and constitute "employee welfare benefit plans" pursuant to 29 U.S.C. § 1002(1). Accordingly, they are also employee benefit plans pursuant to 29 U.S.C. § 1002(3). Although plaintiff's agreements with the participating pharmacies, standing alone, are not employee benefit plans under ERISA, the participating pharmacy agreements clearly are part and parcel of ERISA "employee benefit plans."

Defendants also make the argument that the court does not have jurisdiction under ERISA because plaintiff is not an "employer," as defined under ERISA.[7] Plaintiff has never claimed to be an employer. The fifty-one employers are the employers who

---

**7.** In support of this argument, defendants refer to *Bell v. Employee Security Benefit Association,* 437 F.Supp. 382 (D.Kan.1977). In this case, Employee Security Benefit Association (ESBA) set out to market what they called ERISA employee benefit plans. ESBA was in reality an insurance company. ESBA sold the "plans" to anyone willing to buy, including individuals. The court ruled that the "plan" was insurance and not an employee benefit plan under ERISA: "ESBA's program is pro-

vided by a third-party entrepreneur, not an employer or a pre-existing employee group, such as a union." 437 F.Supp. at 392.

In the case at bar, plaintiff did not create, establish, or market the benefit plans provided to the fifty-one employer groups. The employers and their employees or union representatives created the plans. Plaintiff is an insurance company that provides payment of benefits by contract. The fact that plaintiff is not an employer is irrelevant.

created and maintain the employee benefit plans.

■ The court concludes that plaintiff is an ERISA "fiduciary" within the meaning of 29 U.S.C. § 1002(21) and 29 C.F.R. § 2560.503–1(g)(2). Accordingly, this court has subject matter jurisdiction under 29 U.S.C. § 1132(a)(3).

■ Plaintiff argues that even if the court does not have subject matter jurisdiction under 29 U.S.C. § 1132, plaintiff's assertion of ERISA preemption provides "arising under" jurisdiction pursuant to 28 U.S.C. § 1331. In support of this argument, plaintiff cites a recent decision in which the Second Circuit ruled that it had jurisdiction under § 1331 over an employer's claim that a Connecticut statute was preempted by ERISA. *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 328 (2d Cir.1982).

There is no doubt that determining whether ERISA preempts Connecticut's statute is a federal question in the classic sense that Stone & Webster's claim prevails under its construction of federal law and loses under defendant's construction.

What is in doubt is whether this federal question provides an occasion for invoking the federal question jurisdiction of the district court. The reason for doubt is because plaintiff's claim is one for declaratory judgment. That circumstance creates a tension between two doctrines: (1) The declaratory judgment act is procedural only. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (1976 & Supp. IV 1980), Congress enlarged the range of remedies available to litigants in federal courts, but it did not extend the jurisdiction of the district courts. To permit a declaratory plaintiff to invoke federal jurisdiction to assert the validity of his federal defense would thereby augment the availability of federal jurisdiction. Historically, jurisdiction may not be predicated upon a federal defense. (2) The old rule that the existence of a federal question is to be determined from the face of a well-pleaded complaint, ... would seem to be satisfied whenever a declaratory plaintiff asserts a federal ground of nonliability....

....

Here not only is a right being asserted on the face of the complaint, but an injunction is also being affirmatively sought to prevent interference with that right. This claim raises federal jurisdiction. Regardless of whether, as in *Wycoff [Public Service Commission v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952)], the equitable considerations necessary to support the issuance of an injunction are sufficiently alleged, jurisdiction under § 1331(a) clearly exists since a declaratory judgment action may be entertained even where further relief is unavailable. Thus, the historical test in *Mottley [Louisville & Nashville R. Co. v. Mottley,* 210 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908)] has been satisfied. The declaratory claim asserted is not merely a defense, but affirmative and coercive relief is sought by way of an injunction.

.... Plaintiff's claim here is not only one which originates from a federal statute, but is one whose vindication turns on preemption expressly contained in it. Under these circumstances a declaratory plaintiff can come into federal court asserting that preemption affords it insulation from a state-based claim. Finally, we are satisfied that this case meets the many "arising under" tests for federal jurisdiction, not the least of which is that pragmatic considerations make it eminently logical and sensible that the forum for such a dispute be the federal district court.

*Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d at 326–28 (footnotes and citations omitted). Like the plaintiff in *Stone & Webster,* plaintiff in the instant action seeks declaratory and injunctive relief. For purposes of subject matter jurisdiction, *Stone & Webster* and the instant case are

indistinguishable. The *Stone & Webster* plaintiff was an employer, not an insurer like Blue Cross in the instant case, but this distinction is only relevant for standing. Of course, the state statutes sought to be preempted in this case and *Stone & Webster* are different, but this distinction has no bearing on subject matter jurisdiction. Although this court is not bound by the Second Circuit's decision in *Stone & Webster,* this court is persuaded by the Second Circuit's reasoning. Accordingly, this court concludes that subject matter jurisdiction exists for plaintiff's ERISA preemption claim under 28 U.S.C. § 1331.[8]

Plaintiff claims that this court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 because the action is one to vindicate rights secured by the United States Constitution, including those secured by the Due Process Clause, the Commerce Clause, and the Contracts Clause. In response defendants point out that plaintiff fails to allege that it has been subjected to an *actual* deprivation of its constitutional rights under color of state law by defendants. Defendants contend that because the State Board of Pharmacy has not attempted to enforce the Act, plaintiff has not and can not allege any action under color of state law.

█ To state a cause of action under 42 U.S.C. § 1983, a plaintiff must show first that it has "been deprived of a right 'secured by the Constitution and the laws' of the United States," and second, that defendants deprived plaintiff "of this right acting 'under color of any statute' of the State of" Alabama. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978); *see Gresham Park Community Organization v. Howell,* 652 F.2d 1227, 1237 (5th Cir.1981). To demonstrate that a person has acted under color of state law, the plaintiff must at least show that the person acted "with the

knowledge of and pursuant to" the state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. at 156, 98 S.Ct. at 1733; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 162 n. 23, 90 S.Ct. 1598, 1611 n. 23, 26 L.Ed.2d 142 (1970). To demonstrate that it has been deprived of a right secured by the Constitution and the laws of the United States, plaintiff must demonstrate state action: plaintiff must show that the actions of the person acting under color of state law are "properly attributable" to the State of Alabama. *Flagg Bros., Inc. v. Brooks,* 436 U.S. at 156, 98 S.Ct. at 1733. In summary, plaintiff must allege two elements: (1) the existence of state action and (2) action by the defendant under color of state law.

█ Plaintiff fails to state a claim under 42 U.S.C. § 1983 against the State Board of Pharmacy and its members because plaintiff did not allege any *action* by these defendants. These defendants have not *acted* under color of state law and there are no *actions* attributable to the state (state action). Plaintiff argues that the Act itself was enacted under color of state law by the Alabama legislature. Although this is true, the members of the Alabama legislature are not defendants in this action. Plaintiff cannot impose the actions taken under color of state law by one group of "persons" on another group of "persons," who have not so acted, and state a claim under 42 U.S.C. § 1983.

█ Plaintiff also argues in defense of its § 1983 claim that "this action seeking declaratory and injunctive relief presents a justiciable controversy in the Article III sense," because the Act is valid and enforceable. Plaintiff has confused the issue of ripeness with the requirements under § 1983 of state action and action under color of state law. The action before this court is a justiciable controversy and is ripe for review, even though neither the State

8. *See Shaw v. Delta Air Lines, Inc.,* —— U.S. ——, —— n. 14, 103 S.Ct. 2890, 2899 n. 14, 77     L.Ed.2d 490 (1983).

Board of Pharmacy nor any other state agency has attempted to enforce the Act against plaintiff. *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 507, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972). This does not mean that plaintiff's complaint states a claim against the state defendants under § 1983. Because plaintiff's complaint fails to state a claim against the State Board of Pharmacy and the members thereof under 42 U.S.C. § 1983, this court does not have subject matter jurisdiction of this claim under 28 U.S.C. § 1343. *Gresham Park Community Organization v. Howell,* 652 F.2d at 1237 n. 26.

■ Two defendants, Peacock's Apothecary and Ed Hill, are not part of the State Board of Pharmacy or any other state agency. These two defendants have sought reimbursement for prescriptions from plaintiff at the rates prescribed in § 6 of the Pharmacy Act (§ 34–23–115). It is undisputed that these defendants requested such reimbursement within the knowledge of and pursuant to the Act. Accordingly, they acted under color of state law. Plaintiff, however, has made no attempt to attribute their actions to the state. Because plaintiff has failed to show any state action, the complaint as against Peacock's Apothecary and Ed Hill fails to state a claim under 42 U.S.C. § 1983. This court does not have subject matter jurisdiction under 28 U.S.C. § 1343 over this claim, as a result.

Plaintiff contends that the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because the action arises under ERISA and the Sherman Act, both of which are Acts of Congress regulating commerce. Section 1337(a) of Title 28 states that "[t]he district courts shall have original jurisdiction of any civil action or proceeding under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies ...." Defendant argues that jurisdiction is lacking under § 1337 over the Sherman Act claim because plaintiff has not alleged any interference with or effect on interstate commerce.

■ There is no question that ERISA[9] and the Sherman Act[10] are "Act[s] of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." Defendant is actually challenging the court's jurisdiction over the Sherman Act claim. To establish the court's jurisdiction over a Sherman Act claim, plaintiff must demonstrate either that the challenged activities of defendant are *in* interstate commerce or that these activities *affect* interstate commerce. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 241–42, 100 S.Ct. 502, 508–09, 62 L.Ed.2d 441 (1980); *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 47 (5th Cir.1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). In response to defendant's interstate commerce argument, plaintiff contends that the Act will have a not insufficient impact on interstate commerce because the Act will effect the reimbursements made to Blue Cross of Alabama by the Chrysler Control Plan and the Ford Control Plan, which are in interstate commerce.[11] Apparently plaintiff is arguing that because the reimbursements made to

9. *E.g., Leonardis v. Local 282 Pension Trust Fund,* 391 F.Supp. 554, 556 (E.D.N.Y.1975).

10. *E.g., Christian v. International Ass'n of Machinists,* 7 F.2d 481, 483 (E.D.Ky.1925).

11. Dan W. Taylor, who is Department Manager of the Accounting Department of Blue Cross of Alabama, states the following in paragraph 5 of his affidavit, which plaintiff submitted in support of its Motion for Summary Judgment:

Among the records maintained under my supervision and custody are records reflecting equalization settlements made with each Participating Plan for prescription drug benefit claims and administrative expenses under the Ford and Chrysler employee benefit plans .... As these records reflect, in 1981 Blue Cross and Blue Shield of Alabama ... paid $398,028.33 in prescription drug claims under the Ford plan and $261,084.83 under the Chrysler plan, resulting in a 1981 contract year total of $659,113.16 in prescription drug claim payments under both employee benefit plans. As the attached records also show,

Blue Cross of Alabama by the Chrysler and Ford Control Plans are in interstate commerce, and because § 6 of the Act (§ 34–23–115) would increase the amount that plaintiff would have to pay/reimburse the pharmacies for the prescription drugs, the Act or the activities of defendants would alter the reimbursements made by the Control Plans to Blue Cross of Alabama and thereby *affect* interstate commerce.[12]

The Supreme Court stated in *McLain v. Real Estate Board of New Orleans,* 444 U.S. at 246, 100 S.Ct. at 511, that to satisfy the "effect on commerce" theory, plaintiff need only demonstrate that defendants' activities or the Act "have a not insubstantial effect on the interstate commerce involved." In support of this contention, plaintiff has submitted the affidavit of Terry D. Kellogg, who is a Vice President and an Actuary of Blue Cross of Alabama. Kellogg states in his affidavit that his "primary accountabilities in this position include pricing and forecasting of contingent events and measuring their financial consequences." Kellogg discusses the effect of § 6 of the Act on drug benefit claim payments:

> 3. During 1982 some participating pharmacies in Alabama submitted, apparently due to the Third Party Prescription Program Act, claims based on usual and customary charges rather than on the acquisition cost plus dispensing fee method prescribed by the Participating Agreement. My analysis determined the additional claim cost resulting from those claim charges actually received from those pharmacies above the cost for the same claims based on acquisition cost plus dispensing fee. The analysis shows that those claims which were actually submitted in 1982 on the basis of usual and customary charges would have increased the total amount of prescription drug claim payments in 1982 by 14.5% or $146,280. Since only a small portion (approximately 4.5% according to a recent 3 month sample of paid claims) of the claims submitted in 1982 included the pharmacies' charge rather than acquisition cost plus dispensing fee, the increase in prescription drug benefit costs would be substantially greater if all participating pharmacies had submitted claims on the basis of the Act's reimbursement provisions (which can be expected if BCBSA were to pay claims on the basis of the Act).
>
> 4. In 1982 the total drug benefit claim payments by BCBSA to participating pharmacies was $1,015,721. The total claims as submitted in 1982 by participating pharmacies, including the relatively few claims based on charge rather than acquisition cost plus dispensing fee, was approximately $1,162,000. If 100%, rather than only 4.5%, of the claims submitted had been based on the pharmacies' charge instead of acquisition cost plus dispensing fee, the increased cost of prescription drug benefit claims in 1982 would have been at least several hundreds of thousands of dollars.

Thus, the Act clearly would affect the level of payments made to the pharmacies by Blue Cross of Alabama.[13] Because the reimbursements to Blue Cross of Alabama

---

for those prescription drug claim payments made by Blue Cross and Blue Shield of Alabama in 1981, the Alabama Plan was reimbursed by the Control Plan for the claim payments together with claims administration expense ("CAE"), premium tax, and contingency charge a total of $478,051.59 under the Ford employee benefit plan and $314,409.70 under the Chrysler employee benefit plan, resulting in a 1981 contract year total of $792,461.29 reimbursed to Blue Cross of Alabama by the Control Plan for claims payments and administrative expenses, etc., un-der the Ford and Chrysler employee plans combined.

**12.** Plaintiff mentions the change in reimbursements to Blue Cross of Alabama by these two Control Plans as one of several possible (unnamed) ways that the Act affects interstate commerce.

**13.** Defendants have not contested the conclusions and predictions drawn by Kellogg.

from out-of-state Control Plans pay for a large portion of the drug benefit claim payments made by Blue Cross of Alabama,[14] the court concludes that § 6 of the Act will have a not insubstantial effect on the reimbursements made by the out-of-state Control Plans to Blue Cross, which are in interstate commerce. Accordingly, § 6 of the Act will have a not insubstantial effect on interstate commerce. This court has subject matter jurisdiction under 28 U.S.C. § 1337 over plaintiff's Sherman Act claim.

■ Finally, plaintiff claims that the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over its claims brought under the Contracts Clause, the Commerce Clause, and the Due Process Clause, because the claims "arise under" federal law. To support its claim of jurisdiction, plaintiff primarily relies on the Fifth Circuit's decision in *Braniff International, Inc. v. Florida Public Service Commission,* 576 F.2d 1100 (5th Cir.1978). Defendants failed to argue in their briefs that the court does not have jurisdiction under 28 U.S.C. § 1331 over these three claims. The court concludes, based on its reading of *Braniff,* that the court has jurisdiction over these claims under 28 U.S.C. § 1331.[15]

### *ERISA Preemption*

Plaintiff contends that the Act is preempted by § 514 of ERISA, 29 U.S.C. § 1144, which states as follows:

(a) Except as provided in subsection (b) of this section, the provisions of this sub-

chapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. . . .

29 U.S.C.A. § 1144(a) (1975 and Supp.1983). Plaintiff alleges that the Act conflicts with and affects in several ways the employee benefit plans of the fifty-one employer groups. First, plaintiff charges that § 6 of the Act (§ 34–23–115) mandates a pharmacy reimbursement rate ("usual and customary rate") different from that named in the employee benefit plans ("acquisition cost plus dispensing fee"). Plaintiff points out that the different reimbursement rate will result in substantial additional expenses that will be borne by either the employers or the employees. Second, plaintiff claims that the notice provisions of §§ 4, 5, and 8 of the Act (§ 34–23–113, § 34–23–114, and § 34–23–117) will cause additional expenses that must be borne by either the employers or the employees. Third, plaintiff contends that § 4 of the Act (§ 34–23–113), which requires administrators of programs to notify all enrolled pharmacies of any cancellation of coverage of benefits of any group at least 30 days prior to the effective date of the cancellation, conflicts with the eligibility provisions in the Ford, Chrysler, and GM plans.[16] Plaintiff states that the Act conflicts with other terms of the employee benefit plans, but plaintiff does not name

---

**14.** As noted earlier, Taylor states in his affidavit that Blue Cross of Alabama received $792,-461.29 in reimbursements from the Ford and Chrysler Control Plans in 1981. The following year, the drug benefit claim payments made by Blue Cross of Alabama totaled $1,015,721.00. Although these figures arise from consecutive years, it is clear that the out-of-state Control Plans reimburse Blue Cross of Alabama for most of its drug benefit claim payments.

**15.** *See Shaw v. Delta Air Lines, Inc.,* —— U.S. ——, n. 14, 103 S.Ct. 2890, n. 14, 77 L.Ed.2d 490 (1983).

**16.** In support of this argument, plaintiff, through the affidavit of Paul J. Ryder, Director of the Hourly Benefits Planning and Adminis-

tration Office of the Labor Relations Staff of the Ford Motor Company, points to § 7(a) of the Hospital-Surgical-Medical-Drug-Vision-Hearing Aid Coverages of the Ford Insurance Program, which provides as follows:

Hospital-surgical-medical-drug-vision-hearing aid coverages for an employe whose employment is terminated by quitting, being discharged, failing to report or overstaying leave, shall terminate as of the last day of the month in which employment is terminated unless such a former employe incurring a break in seniority by being discharged, failing to report or overstaying leave has a grievance pending to protest his loss of seniority under Article VIII, Section 5 of the collective bargaining agreement or to protest a discharge under Article VII, Section 4(b) of the

or explain these additional conflicts in its brief.

Defendants have made no response to plaintiff's argument that the Act conflicts with and affects the employee benefit plans in three ways. Accordingly, the court assumes that these conflicts and effects exist.

The issue before the court is whether the Act "relate[s] to" the employee benefit plans of the fifty-one employer groups, pursuant to § 514 of ERISA. *See Shaw v. Delta Air Lines, Inc.,* —— U.S. ——, ——, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983); *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). If the Act "relate[s] to" the employee benefit plans, the Act will be preempted by § 514(a) unless the Act fits within one or more of the exceptions listed in § 514(d), 29 U.S.C. § 1144(d). *See Shaw v. Delta Air Lines, Inc.,* —— U.S. at ——, 103 S.Ct. at 2899.

The Supreme Court discussed the broad nature of ERISA preemption in *Alessi:*

> Although the Supremacy Clause invalidates state laws that "interfere with, or are contrary to the laws of Congress ...," *Gibbons v. Ogden,* 9 Wheat. 1, 211 [6 L.Ed. 23] (1824), the " 'exercise of federal supremacy is not lightly to be presumed,' " *New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 413 [93 S.Ct. 2507, 2513, 37 L.Ed.2d 688] (1973), quoting *Schwartz v. Texas,* 344 U.S. 199, 203 [73 S.Ct. 232, 235, 97 L.Ed. 231] (1952). As was recently reiterated, "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence

of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained.' " *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317 [101 S.Ct. 1124, 1130, 67 L.Ed.2d 258] (1981), quoting *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963). See *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–526 [97 S.Ct. 1305, 1309–1310, 51 L.Ed.2d 604] (1977); *Perez v. Campbell,* 402 U.S. 637, 649 [91 S.Ct. 1704, 1711, 29 L.Ed.2d 233] (1971); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947); *Hines v. Davidowitz,* 312 U.S. 52, 61–62 [61 S.Ct. 399, 401, 85 L.Ed. 581] (1941).

> In this instance, we are assisted by an explicit congressional statement about the pre-emptive effect of its action.... This provision [§ 514] demonstrates that Congress intended to depart from its previous legislation that "envisioned the exercise of state regulation power over pension funds," *Malone v. White Motor Corp.,* 435 U.S. 497, 512, 514 [98 S.Ct. 1185, 1193, 1194, 55 L.Ed.2d 443] (1978) (plurality opinion), and meant to establish pension plan regulation as exclusively a federal concern.

> . . . .

> .... ERISA makes clear that even indirect state action bearing on private pensions may encroach upon the area of exclusive federal concern. For purposes of the pre-emption provision, ERISA defines the term "State" to include: "a

collective bargaining agreement. Except as provided above, hospital-surgical-medical-drug-vision-hearing aid coverages shall terminate as of the last day of the month following the month in which an employe was last at work unless continued under Section 4 or 6 above.

Plaintiff fails to explain how § 4 of the Act would conflict with the eligibility provisions such as the above clause. The only conflict between the two, conceivable by the court, is that the termination of coverage under the hos-

pital-medical-etc. of an employee whose employment was terminated for quitting, discharge, failing to report, or overstaying a leave, would occur usually in less than 30 days after the termination of the employee's employment (coverage terminates on the last day of the month during which employment terminates). Thus, the administrator would be unable to provide the pharmacies with notice 30 days prior to cancellation of coverage. The court will construe plaintiff's argument accordingly.

State, any political subdivision thereof, or any agency or instrumentality of either, which purports to regulate, *directly or indirectly,* the terms and conditions of employee benefit plans covered by this subchapter." 29 U.S.C. § 1144(c)(2) (emphasis added). ERISA's authors clearly meant to preclude the States from avoiding through form the substance of the pre-emption provision.

*Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. at 522–23, 525, 101 S.Ct. at 1905–06, 1907 (footnotes omitted). The *Alessi* Court ruled that a New Jersey law which prohibited the integration (set off) of workers' compensation benefits with employees' retirement pension benefits was pre-empted by § 514 of ERISA. *Id.,* at 524, 101 S.Ct. at 1906. Although the Court ruled that the New Jersey law "relate[d] to" the employee benefit plans, the Court did not define the phrase "relate to":

> Whatever the purpose or purposes of the New Jersey statute, we conclude that it "relate[s] to pension plans" governed by ERISA because it eliminates one method for calculating pension benefits—integration—that is permitted by federal law. ERISA permits integration of pension funds with other public income maintenance moneys for the purpose of calculating benefits, and the IRS interpretation approves integration with the exact funds addressed by the New Jersey workers' compensation law. New Jersey's effort to ban pension benefit offsets based on workers' compensation applies directly to this calculation technique. We need not determine the outer bounds of ERISA's pre-emptive language to find this New Jersey provision an impermissible intrusion on the federal regulatory scheme.

*Id.,* at 524–25, 101 S.Ct. at 1907 (footnotes omitted). It was not necessary for the

Court to provide such a definition because the Court determined that the New Jersey statute directly conflicted with federal law, which "specifically allowed pension benefit offsets based on workers' compensation." *Id.,* at 521, 101 S.Ct. at 1905. As the Court explained in its recent opinion in *Shaw v. Delta Air Lines, Inc.,* —— U.S. at —— n. 15, 103 S.Ct. at 2900 n. 15: the *Alessi* "Court relied not on § 514(a)'s language and legislative history, but on the state law's frustration of congressional intent." Accordingly, the *Alessi* Court held that the New Jersey statute "relate[d] to" pension plans because it conflicted with Congress' expression of federal law.

The *Alessi* Court stated an additional consideration that supported preemption of the New Jersey statute by ERISA:

> ERISA leaves integration, along with other pension calculation techniques, subject to the discretion of pension plan designers. Where, as here, the pension plans emerge from collective bargaining, the additional federal interest in precluding state interference with labor-management negotiations calls for pre-emption of state efforts to regulate pension terms. As a subject of collective bargaining, pension terms themselves become expressions of federal law, requiring preemption of intrusive state law.

*Alessi,* 451 U.S. at 525–26, 101 S.Ct. at 1907–08 (footnotes and citations omitted).

The Supreme Court in *Shaw* finally defined the phrase "relate to" as it is used in § 514(a), 29 U.S.C. § 1144(a). In *Shaw,* a number of employees contended that two New York statutes, the Disability Benefits Law [17] and the Human Rights Law,[18] were preempted by § 514(a) of ERISA because the statutes "relate[d] to" pension plans. First, the Court determined that these two statutes did not directly conflict with Con-

---

**17.** N.Y.Exec.Law §§ 290–301 (McKinney 1982 and Supp.1982–1983). This law requires employers to pay sick-leave benefits to employees who are unable to work because of pregnancy or other nonoccupational disabilities.

**18.** N.Y.Work.Comp.Law §§ 240–242 (McKinney 1965 and Supp.1982–1983). This law prohibits discrimination in employment, including discrimination in employee benefit plans on the basis of pregnancy.

gress' expression of federal law ("state law's frustration of congressional intent"): "That kind of tension is not present in this case; while federal law did not prohibit pregnancy discrimination during the relevant period, Congress, in enacting ERISA, demonstrated no desire to permit it. *Alessi's* recognition of the exclusive federal role in regulating benefit plans, therefore, is instructive but not dispositive." *Shaw,* —— U.S. at —— n. 15, 103 S.Ct. at 2900 n. 15. Next, the Court defined "relate to" and applied the definition to the two statutes:

> We have no difficulty in concluding that the Human Rights Law and Disability Benefits Law "relate to" employee benefit plans. The breadth of § 514(a)'s pre-emptive reach is apparent from that section's language. *A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.* Employing this definition, the Human Rights Law, which prohibits employers from structuring their employee benefit plans in a manner that discriminates on the basis of pregnancy, and the Disability Benefits Law, which requires employers to pay employees specific benefits, clearly "relate to" benefit plans. We must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.

> In fact, however, Congress used the words "relate to" in § 514(a) in their broad sense. To interpret § 514(a) to pre-empt only state laws specifically designated to affect employee benefit plans would be to ignore the remainder of § 514. It would have been unnecessary to exempt generally applicable state criminal statutes from pre-emption in § 514(b), for example, if § 514(a) applied only to state laws dealing specifically with ERISA plans.

> Nor, given the legislative history, can § 514(a) be interpreted to pre-empt only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like. The bill that became ERISA originally contained a limited preemption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that the section's pre-emptive scope was as broad as its language.

*Shaw,* —— U.S. at ——, 103 S.Ct. at 2899 (emphasis added) (footnotes and citations omitted). The Court indicated that it was by no means stretching the definition of "relate to" by ruling that these two New York statutes fell within that definition:

> Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan. Cf. *American Telephone & Telegraph Co. v. Merry,* 592 F.2d 118, 121 (CA2 1979) (state garnishment of a spouse's pension income to enforce alimony and support orders is not pre-empted). The present litigation plainly does not present a borderline question, and we express no views about where it would be appropriate to draw the line.

*Id.,* at ——, n. 21, 103 S.Ct. at 2901 n. 21. The Court ruled that the Human Rights Law was partially exempted from preemption by § 514(d) and that the Disability Benefits Law was completely exempted from preemption by § 514(b)(3). *Id.,* at ——, 103 S.Ct. at 2905.

Both parties discussed a number of ERISA preemption cases in their briefs. The Supreme Court's decision in *Shaw,* coupled with the *Alessi* opinion, however, renders unnecessary a discussion and analysis of these cases.

■ According to *Shaw,* the Pharmacy Act "relate[s] to" the employee benefit plans either if the Act frustrates congressional intent or if the definition of "relate to," as stated by the Supreme Court in

*Shaw,* is satisfied. To frustrate congressional intent, the Act must directly conflict with Congress' expression of federal law. *See Shaw,* —— U.S. at —— n. 15, 103 S.Ct. at 2900 n. 15. Although Blue Cross of Alabama claims that its acquisition cost plus dispensing fee reimbursement rate is permitted by federal law, Blue Cross has not alleged or established that federal law specifically allowed or approved of this reimbursement rate. Blue Cross can argue only that federal law does not disallow the acquisition cost plus dispensing fee reimbursement rate. Because Blue Cross has failed to show that the reimbursement rate dictated by the Act (usual and customary rate) conflicts with Congress' expression of federal law, the Act's reimbursement rate does not frustrate congressional intent. Blue Cross has failed to make a similar showing regarding the Act's notice provisions (§§ 4, 5, and 6) and the 30 day cancellation provision of the Act (§ 4). Because no part of the Pharmacy Act frustrates congressional intent by conflicting with Congress' expression of federal law, the Act does not "relate to" the employee benefit plans in the manner that the New Jersey statute in *Alessi* "relate[d] to" the plans. *See id.* Accordingly, the Pharmacy Act "relate[s] to" the plans only if "it has a connection with or reference to such ... plan[s]." *Id.,* at ——, 103 S.Ct. at 2899.

■ The Pharmacy Act precludes employers and employees from structuring employee benefit plans that include third party prescription programs which call for reimbursement rates that "are less than the usual and customary rates paid by consum-

ers not covered by a third party plan." Ala.Code § 34–23–115 (Supp.1982). Although the Act directly regulates the agreements and relationships between insurers and pharmacies, it effectively regulates what employers and employees can and cannot include in employee benefit plans. The employee benefit plans of the fifty-one employer groups, which are involved in this action, all mandate reimbursement rates that violate the Act. Section 2 of the Act (§ 34–23–111) makes explicit reference to employee benefit plans and defines "third party prescription program" to include employee benefit plans. Based on these facts, the court holds that the Pharmacy Act "has a connection with or reference to" the employee benefit plans of the fifty-one employer groups. Accordingly, the Act "relate[s] to" these plans and the Act is due to be preempted unless the Act fits within one of the exemptions listed in § 514.

■ The only exemption claimed by defendants is that stated in § 514(b)(4), 29 U.S.C. § 1144(b)(4): "Subsection (a) of this section shall not apply to any generally applicable criminal law of a State." Defendants rely on § 34–23–13,[19] which establishes criminal penalties for violations of the provisions in chapter 23 of title 34 (the chapter that includes the Pharmacy Act). Defendants provide no authority in support of this argument that § 34–23–13 renders the Pharmacy Act a generally applicable criminal law. Because § 34–23–13 is directed primarily at pharmacists, this court holds that the Pharmacy Act is not a *generally* applicable criminal law.[20] Accordingly,

---

**19.** That statute provides as follows:

Any person ... who violates any of the provisions of this chapter; or who willfully violates any published rule or regulation of the board; ... shall be guilty of a misdemeanor and, upon conviction, shall be punished by fine of not more than $1,000.00 for each offense, to be fixed by the court trying said case, and in addition thereto may be, in the discretion of the court trying said case,

sentenced to hard labor for the county for a period not to exceed 12 months.
Ala.Code § 34–23–13 (1975).

**20.** *See National Carriers' Conference Committee v. Heffernan,* 454 F.Supp. 914, 915–16 (D.Conn.1978); *Commonwealth v. Federico,* 383 Mass. 485, 419 N.E.2d 1374, 1377–78 (Mass.1981).

the Pharmacy Act is not exempt, pursuant to § 514(b)(4), from § 514(a).[21]

The court's conclusions that the Pharmacy Act "relate[s] to" employee benefit plans and that the Act is not exempt from ERISA preemption lead to the conclusion that the Act is preempted insofar as it bears on employee benefit plans governed by ERISA. As in *Alessi,* the federal interest in precluding state interference with labor-management negotiations bolsters this court's conclusion that the Act is due to be preempted. The benefit plan cancellation provisions and the pharmacy reimbursement rate (acquisition cost plus a dispensing fee) were agreed upon in collective bargaining negotiations. As a result, these terms became "expressions of federal law, requiring preemption of intrusive state law," according to the Supreme Court in *Alessi.*

This court concludes that the Third Party Prescription Program Act, Alabama Code §§ 34–23–110–118 (Supp.1982), is preempted by federal law insofar as it bears on employee benefit plans governed by ERISA.

This court's conclusion that the Act is preempted by § 514(a) of ERISA will result in complete relief for plaintiff. Because plaintiff's remaining four claims are based on Constitutional grounds, this court will adhere to "the familiar rule that decision of Constitutional questions should be avoided wherever fairly possible." *Communist Party v. Catherwood,* 367 U.S. 389, 392, 81 S.Ct. 1465, 1467, 6 L.Ed.2d 919 (1961).

Plaintiff shall submit a proposed order to the court within five days after entry of this Memorandum Opinion. Defendants shall have three days thereafter to object to plaintiff's proposed order. ·

---

**21.** The court notes that in *Shaw, supra,* certain portions of the New York statutes under consideration were saved from pre-emption solely because of the exceptions to § 514(a). Neither the exemptions discussed in *Shaw* nor any other exemptions are applicable here.