**Jay ANGOFF, Respondent,**

v.

**Lawrence KENEMORE and Association of Trust and Guarantee, Appellants.**

**No. WD 48993.**

Missouri Court of Appeals, Western District.

Nov. 29, 1994.

**Thomas CHAPMAN, Employee/Appellant,**

v.

**JONES CHEMICALS, INC., Employer/Respondent.**

**No. 66011.**

Missouri Court of Appeals, Eastern District, Division One.

Nov. 29, 1994.

Sandra L. Schermerhorn, Kansas City, for appellants.

Dori J. Drummond, Dept. of Ins., Jefferson City, for respondent.

Before KENNEDY, P.J., and BRECKENRIDGE and SPINDEN, JJ.

SPINDEN, Judge.

Jay Angoff, director of the Missouri Department of Insurance, seeks to regulate sales by Lawrence Kenemore and Association of Trust and Guarantee (AT & G) in Missouri. Kenemore and AT & G claim that

they were selling employee benefit plans, not insurance, and that state regulation of their activity was preempted by the federal Employee Retirement Income Security Act (ERISA). Angoff contends that AT & G and Kenemore had set up a subterfuge to avoid state regulation. The trial court agreed with Angoff and issued a permanent injunction prohibiting AT & G and Kenemore from selling their plans in Missouri without a certificate of authority.

AT & G and Kenemore contend that 29 U.S.C. § 1144 (ERISA) preempts state regulation of their employee benefits plans. They also contend that the permanent injunction order was vague and was not supported by substantial evidence. We disagree and affirm the trial court's judgment.

Kenemore and two partners organized AT & G to sell health and welfare benefits packages to employers. The benefits included workers' compensation, hospitalization, accidental death, vision care, death benefits, and disability benefits.

AT & G told employers who purchased the plan that they had to join AT & G and their employees had to join the National Employees Trade Association Local 101 (NETA). AT & G, however, sold benefits to one employer whose employees did not join NETA. AT & G provided the employers with "authorization cards" to enroll their employees in NETA, and the employers paid NETA's dues for the employees. The employees who belonged to NETA engaged in various occupations. Employees' wages, work hours, and other working conditions did not change when an employer joined AT & G. For at least one employer, the employees did not participate in any union elections and did not select NETA as their bargaining agent; nor did the employees engage in any union activities or have a role in selecting the AT & G benefits package. AT & G told its members:

> ATG, Association of Trust & Guarantee, clearly in no way, would bring our members into an arrangement that would take away your control of your employees.

The officers and directors of ATG Association of Trust & Guarantee, wish to assure you that we stand for free enterprise and that includes the total freedom of members to run the daily operations of their companies.[1]

AT & G told its members that the sole purpose for the collective bargaining agreement with NETA was to allow for participation in NETA's welfare fund to provide the members' employees with workers' compensation and health benefits. AT & G told its members:

> The worker's compensation benefits and health benefits are provided by the welfare fund of N.E.T.A. National Employees Trade Association Local 101, through a collective bargaining agreement between N.E.T.A. National Employees Trade Association Local 101 and ATG Association of Trust & Guarantee. As you will note in the collective bargaining agreement, article XI (eleven), no strike/no lockout, that "during the life of this agreement, there shall be no strike, stoppage of work, slow down, picketing, boycotting, lockout, or any other economic pressure or activity of any other kind by either party against the other for any reason or matter, controversy or grievance, or claim or breach of contract of any kind, nature or description, between the parties hereto."
>
> In fact, you can see that the very things that you and the association dislike about collective bargaining have been removed. The collective bargaining agreement merely allows us to participate in the welfare fund of N.E.T.A. National Employees Trade Association Local 101. This arrangement allows us to be in compliance with a federal law that preempts state regulatory authority.[2]

The members were not involved in the benefit plans' administration. AT & G administered the benefit plans. AT & G gave its associates commissions for selling the plans.[3] AT & G's benefits were not guaranteed under a contract or policy of insurance issued

---

1. The original was in all capital letters.

2. The original was in all capital letters.

3. AT & G told its associates, "Your quickest big money will come from your selling the benefits program directly to customers."

by any insurance entity authorized to conduct business in Missouri.

AT & G and Kenemore contend that they were not selling or soliciting "insurance" in Missouri—they were selling employee benefit plans. They contend that the Department had no authority over its employee benefit plans because such authority is preempted by ERISA. We disagree.

■ ERISA preempts state laws which regulate employee benefit plans, but Congress did not intend for the act to interfere with state regulation of insurance schemes. 29 U.S.C. § 1144;[4] *Empire Blue Cross and Blue Shield v. Consolidated Welfare Fund,* 830 F.Supp. 170, 172 (E.D.N.Y.1993). As this court's Eastern District said in *St. Louis Children's Hospital v. Commerce Bancshares, Inc.,* 799 S.W.2d 87, 91 (Mo.App. 1990):

> There are three basic provisions of ERISA relating to its preemptive effect. The "pre-emption clause" provides that ERISA supercedes any and all state laws "relating to" ERISA-covered employee benefit plans. 29 U.S.C. § 1144(a). The "savings clause", however, limits this section by providing that no ERISA section exempts any person from state law regulating insurance, banking or securities. 29 U.S.C. § 1144(b)(2)(A). The "deemer clause" then qualifies the "savings clause" by precluding any state law purporting to regulate insurance from deeming an employee benefit plan to be an insurance company. 29 U.S.C. § 1144(b)(2)(B).

The issue we must resolve, therefore, is whether AT & G's scheme was an employee benefit plan or insurance in disguise. Given the linguistic overlaps in ERISA's language, this is not an easy task.[5] Exacerbating the difficulty is ERISA's failure to define "insurance."

■ ERISA defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). AT & G's plan was not a pension benefit plan; therefore, whether AT & G's scheme was an "employee benefit plan" turns on whether it fit within the definition of "employee welfare benefit plan." 29 U.S.C. § 1002(1) defines "employee welfare benefit plan:"

> [A]ny plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

So, we must determine whether AT & G's plan was established by an employer or an

---

**4.** 29 U.S.C. § 1144 says, "(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this section. This section shall take effect on January 1, 1975. (b) ... (2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities. (B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of

providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies."

**5.** The United States Supreme Court has complained that ERISA is "not a model of legislative drafting." *Metro. Life Ins. Co. v. Mass.,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

employee organization or both. ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5).

AT & G did not act directly as an employer. It had no employment or economic relationship with its members' employees.

Nor did AT & G act indirectly in the interest of an employer in relation to an employee benefit plan. In *MDPhysicians & Associates, Inc. v. State Board of Insurance*, 957 F.2d 178, *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992), the United States Court of Appeals for the Fifth Circuit held that an association of physicians did not act as a group or association of employers in the interest of employers who subscribed to the association's benefit plan. The court found that the association established the plan to generate profits and that the subscribing employers were not involved in the establishment and maintenance of the plan.

The *MDPhysicians* court concluded that Congress evidenced its intent, shortly after the passage of ERISA, that ERISA not cover plans maintained by entrepreneurs for the purpose of marketing insurance. In particular, the court recognized the Activity Report of the Committee on Education and Labor, which said:

"[C]ertain entrepreneurs have undertaken to market insurance products to employers and employees at large, claiming these products to be ERISA covered plans. For instance, persons whose primary interest is in profiting from the provision of administrative services are establishing insurance companies and related enterprises. The entrepreneur will then argue [its] enterprise is an ERISA benefit plan which is protected, under ERISA's preemption provision, from state regulation.... [W]e are of the opinion that these programs are not 'employee benefit plans'.... [T]hese plans are established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others. They are not established or main-

tained by the appropriate parties to confer ERISA jurisdiction.... They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.

....

... [W]e do not believe that the statute and legislative history will support the inclusion of what amounts to commercial products within the umbrella of the ['employee benefit plan'] definition.... [T]o be properly characterized as an ERISA employee benefit plan, a plan must satisfy the definitional requirement of section 3(3)[, which defines 'employee benefit plan',] in both form and substance[.]"

*Id.* at 184 (quoting H.R.Rep. No. 1785, 94th Cong., 2d Sess. 48 (1977)). The Fifth Circuit acknowledged that this report was not contemporaneous legislative history, but it said that "we, like other courts, find the Report ' "virtually conclusive" as to legislative intent.' " *Id.* (citations omitted).

In determining that the plan in *MDPhysicians* was not covered by ERISA, the court looked to whether the subscribing employers established the plan and whether they participated in the day-to-day operation or administration of the plan. *Id.* at 185. AT & G established and operated the plan with the help of NETA, not the subscribing employers. The *MDPhysicians* court also looked to whether the association acted indirectly for the subscribing employers in relation to the plan. The court concluded that the association acted for itself rather than for the employers. *Id.* AT & G acted for itself rather than for the employers. In AT & G's profile and training packet, it noted that one of its objectives was to make a profit. It recruited sales associates to market the benefits to employers. AT & G acted in its own interest in establishing the plan and not in the interest of the employers who purchased the benefits. We conclude, therefore, that AT & G was not an employer within the meaning of ERISA.

■ Because AT & G was not an employer, we must determine whether the employee welfare benefit plan was established by an

employee organization. An "employee organization" is:

> [A]ny labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

29 U.S.C. § 1002(4). "For a program to meet [the definition of 'employee organization,'] it must be a program in which 'employees participate' and the organization must exist 'for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment.'" *Bell v. Employee Security Benefit Association*, 437 F.Supp. 382, 394 (D.Kansas 1977).

In *State of Texas v. National Council of Allied Employees*, 791 F.Supp. 1154 (W.D.Tex.1992), a United States District Court considered the issue of whether employees of subscribing employers of an employee benefit plan participated in a purported labor union. Subscribers to the plan testified that they did not know that they were members of a union or a labor organization, that they did not exercise any day-to-day control over any aspect of the union or the plans, and that they did not know of any voting rights or participatory rights they might have. *Id.* at 1158, 1161. The court held that the plan's sponsors had not met their burden of establishing ERISA pre-emption.

We find no evidence that employees in AT & G's plan participated in NETA. Employees of at least one employer did not participate in or even join NETA. The employees never designated NETA as their collective bargaining agent or paid it dues. When AT & G requested the employees to sign a card recognizing NETA as their bargaining agent, the employer refused, but AT & G did not terminate the benefits until the employer quit paying the premiums.

We find no evidence that NETA was established, in whole or in part, to deal with employers concerning an employee benefit plan or other matters incidental to employment relationships. Rather, NETA's only purpose was to structure a business relationship by which AT & G could provide workers' compensation and health benefits to employers. As AT & G said in its sales materials, the "collective bargaining agreement merely allows us to participate in the welfare fund of N.E.T.A.[, and] allows us to be in compliance with a federal law that pre-empts state regulatory authority."[6] AT & G told its members that "clearly in no way, would [we] bring our members into an arrangement that would take away your control of your employees." They also told them that "the very things that you and the association dislike about collective bargaining have been removed." We conclude that the AT & G plan was not established or maintained by an employee organization.

Nor, did AT & G's plan meet the definition of employee benefit plan set out in *Bell*, 437 F.Supp. at 391:

> (1) [sic] [I]t was provided by an employer or homogeneous employee organization, such as a union; (b) it was non-commercial in nature; (c) it did not involve solicitation; (d) it was not intended to be actuarially sound; (e) because the employees could look only to the fund, and not to the provider of that fund, the rates were substantially lower than insurance rates.

An employer did not provide the plan; an entrepreneur seeking to obtain a profit did. Nor was the plan provided by a "homogeneous employee organization"; rather, the group was a hodge-podge of employees from various occupations. AT & G sold the plan through its agents' solicitations, and it emphasized to its agents the profits they could make by soliciting and selling the plan.

As the court said in *Bell*, "[Congress] did not intend to allow companies, motivated by profit, to escape insurance regulation by setting up a program that is an EBP [employee benefit plan] in name only." *Id.* at

6. All of the quotations in this paragraph were originally in all capital letters.

392. Hence, we conclude that ERISA did not preempt Angoff from regulating AT & G's scheme.

■ In their second point, AT & G and Kenemore assert that the trial court erred in granting the permanent injunction order because the order was vague. They contend that the trial court did not specifically find that they were selling or soliciting insurance and that the trial court failed to advise them fairly and precisely of what conduct is forbidden. We disagree.

The trial court's order said:

Based on [Angoff's] Petition for Injunction, the evidence adduced at the hearing of November 9, 1993, and the briefs of [the parties] submitted in the above-captioned case and section 375.786 and 375.787, RSMo, this Court orders the following:

1. Defendants Larry Kenemore, George Shinsky, Shawnee Mertens, and Association of Trust and Guarantee are permanently enjoined from making or proposing to make any insurance contract and from directly or indirectly acting as an agent for, or otherwise representing or aiding on behalf of another, any person or insurance company in the solicitation, negotiation, procurement or effectuation of insurance or renewals thereof or in the dissemination of information as to coverage or rates, or forwarding of applications, or delivery of policies or contracts, or inspection of risks, a fixing of rates or investigation or adjustment of claims or losses or in the transaction of matters subsequent to effectuation of the contract and arising out of it, or in any manner representing or assisting a person or insurance company in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state.

2. Specifically, and without limiting the effect of paragraph one above, Defendants Larry Kenemore, George Shinsky, Shawnee Mertens, and Association of Trust and Guarantee are permanently enjoined from soliciting any person to apply for, taking any application for, receiving any premiums for, or making or proposing to make any contract for occupational injury or illness coverage or any other insurance benefits.

3. This permanent injunction applies to and enjoins not only the named Defendants in this case, but any agent or employee of any Defendant having actual knowledge of this order.

Rule 92.02(d) requires every injunction order to (1) set forth the reasons for its issuance; (2) be specific; (3) describe in reasonable detail, and not by reference to the petition of other documents, the act or acts to be restrained; and (4) bind only the parties to the action and their privies. Although a trial court is vested with broad discretionary power to shape and fashion relief, it must comply with Rule 92.02(d). *Concannon v. Hanley Development Corporation*, 769 S.W.2d 183, 187–88 (Mo.App.1989).

The trial court's order was clear as to the acts to be enjoined. The trial court was also clear in its reason for issuing the injunction. It referred directly to § 375.786, RSMo Cum. Supp.1993, which prohibits any insurance company from transacting "insurance business in this state ... without a certificate of authority." The trial court's reason for issuing its order was because it deemed AT & G and Kenemore to be violating this statute.

In their final point, AT & G and Kenemore argue that the trial court erred in issuing the permanent injunction because Angoff did not present evidence that they sold or solicited the sale of insurance in Missouri. AT & G's and Kenemore's argument is disingenuous.

In their brief, they describe their plan as "workers' compensation benefits in addition to health insurance for employees." AT & G's literature described NETA as "Provid[ing] Occupational Illness and Injury (Worker's Comp) and Additional Benefits from it's [sic] Welfare Fund" and assured that it "[paid] all valid claims." Among materials provided to AT & G's members was "Claims Handling Guidelines" put out by AT & G's "Claims Department." The guidelines instructed its members:

[F]orward to ATG either by fax or mail an ATG incident report form immediately when the incident happens.... Please see that the employee is treated at your medical facility immediately.... Do not pay any bills.... Have all bills forwarded

to either ATG or NCA claims administration.[7] ... You will be billed by NCA claims administration for your deductible immediately after they receive the incident report.[8]

AT & G and Kenemore were selling insurance. AT & G's and Kenemore's scheme clearly fit within § 375.786.2's definition of what constituted the business of insurance. Hence, AT & G and Kenemore violated, as the trial court found, § 375.785.1's requirement that they obtain a certificate of authority before peddling their scheme in Missouri.

AT & G and Kenemore also claim that the trial court erroneously admitted affidavits of three witnesses into evidence and deprived them of the opportunity to cross-examine the witnesses. Even if the trial court erred in admitting the affidavits, and we do not so conclude, the evidence was cumulative to other evidence.

■ In one affidavit, an admissions specialist of the Department of Insurance said that AT & G did not possess a Missouri certificate of authority and was not authorized to transact insurance business in Missouri. At the hearing, Kenemore admitted this. In the second affidavit, a Missouri resident attested that an AT & G agent had solicited his purchase of the AT & G scheme. Angoff submitted this affidavit to prove that AT & G and Kenemore were soliciting sales in Missouri. Kenemore admitted this. The third affidavit was from the president of the National Organization of Industrial Trade Unions (NOITU) who said that NOITU suspended NETA's charter. Kenemore admitted this. We fail to understand how AT & G and Kenemore were prejudiced by evidence to which they readily admitted. *See Biller v. Big John Tree Transplanter Manufacturing and Truck Sales, Inc.*, 795 S.W.2d 630, 635 (Mo.App.1990).

We affirm the judgment of the trial court.

All concur.

---

7. The parties did not inform us of what the NCA claims administration was.

8. The original was in all capital letters.